John D. CHAPMAN, Plaintiff–
Appellant,

v.

AI TRANSPORT, et al., Defendants–
Appellees.

Nos. 97–8838, 97–9086 and 97–9269.

United States Court of Appeals,
Eleventh Circuit.

Oct. 2, 2000.

Teresa A. Ferrante, Lawyers Committee for Civil Right Under Law, Washington, DC, R. Lawrence Ashe, Jr., Nancy E. Rafuse, William B. Hill, Jr., Paul, Hastings, Janofsky & Walker, LLP, Michael Dubus, Atlanta, GA, Richard T. Seymour, Washington, DC, for Plaintiff–Appellant.

David N. Schaeffer, Kidd & Vaughan, Atlanta, GA, James J. Oh, Allison Zousmer Stein, P. Kevin Connelly, Martin Harris, Connelly, Sheehan & Moran, Chicago, IL, for Defendants–Appellees.

Allan H. Weitzman, Proskauer, Rose, Gaetz & Mendelsohn, Boca Raton, FL, Geoffrey L. J. Carter, Washington, DC, for Amicus Curiae, EEOC.

Before ANDERSON, Chief Judge, and TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, MARCUS and WILSON, Circuit Judges.*

CARNES, Circuit Judge:

John Chapman filed a lawsuit in federal district court against AI Transport, AIG Aviation, American International Group Claims Services ("AIGCS"), and American International Group ("AIG") (collectively, "the defendants"). His complaint included claims of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34, and disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–17. The district court granted summary judgment in favor of the defendants on Chapman's ADEA claims, but it denied summary judgment on the ADA claims. Chapman's ADA claims were tried before a jury, which returned a verdict in favor of the defendants.

A panel of this Court affirmed the judgment insofar as it embodied the jury's verdict on the ADA claims, but the panel reversed the grant of summary judgment on the ADEA claims and also vacated the district court's award of costs to the defendants. *See Chapman v. AI Transport,* 180 F.3d 1244 (11th Cir.1999). We granted rehearing en banc primarily to decide some important issues that arise regularly in job discrimination cases. Those issues have to do with an employer's ability to select its own criteria for making employment decisions and with the permissibility of using subjective criteria. We had also planned to address an issue about whether evidence impeaching the credibility of one corporate official could be used to undermine the credibility of a different decision-maker. As we will explain in due course, however, it turns out that general corporate credibility issue is not presented by the record. While we have the case, we will also use it to decide whether a district

---

* Judge Frank Hull recused herself and did not participate in this decision.

court may consider a losing party's financial status in awarding costs to the prevailing party.

## I. FACTS

### A. *Chapman's Pre–October 1988 Employment History*

From May 1964 until September 1969, John Chapman worked as a claims representative for the Hartford Insurance Company. He voluntarily left Hartford Insurance in September 1969 and began working as a claims supervisor for Home Insurance Company in Atlanta, Georgia. He left Home Insurance in June 1985. In July 1985, Chapman began working for Claimsman, Inc., another insurance company, as a senior liability claims examiner. While at Claimsman, Chapman handled the J. Gordon Gaines ("Gaines") account.

In August 1986, Chapman voluntarily left the Claimsman company in order to accept an offer to become manager of the general liability unit of Gaines, which had decided to start its own claims department. In April 1988, Gaines was purchased by Liberty National Fire Insurance Company. Liberty National moved its claims division to Birmingham, Alabama, and offered Chapman, who was apparently living in Atlanta, the opportunity to continue working in the claims division. Chapman decided instead to move to Long Beach, California and work for B.R. Martin Company. At B.R. Martin, Chapman supervised the files of Liberty National Fire Insurance Company. In September 1988, after only a few months with B.R. Martin, Chapman left that company and moved back to Atlanta, Georgia.

### B. *Chapman's Tenure at AI Transport and His Application to AIGCS*

In October 1988, Chapman began working for AI Transport in Atlanta as a senior claims representative. He interviewed with and was hired by Robert Spann, who was then the Manager of Claims at AI Transport. In 1989, Chapman was promoted to supervisor. His performance reviews usually ranged from the middle-of-the-scale "meets expectations" to the second-highest category, "above expectations." [1]

In late 1989, AI Transport became a division of AIG Aviation, which is itself a subsidiary of AIG. AIG owns in whole or in part approximately 120 companies worldwide, including AIGCS. AIG, AIG Aviation, AI Transport and AIGCS are all insurance-related companies.

In June 1992, AI Transport instituted a reduction-in-force. Three of Chapman's four subordinates were terminated. AI Transport removed Chapman's supervisory duties and assigned him to handle the claims representative duties formerly performed by his dismissed subordinates. Chapman was also transferred to the position of Self–Insured Retention ("SIR") Manager.

During September and October 1992, AIGCS restructured its organization and created new positions in the process. [2] On September 17, 1992, Chapman wrote James Wogsland, a vice president at AIGCS, about open positions. Wogsland and Ward Turnquist, another AIGCS vice president, interviewed Chapman on October 13, 1992 for the position of Casualty Claims Manager. Turnquist testified in deposition that his assignment from Wogsland was "to screen these people for that position." Turnquist stated that he inter-

---

**1.** Professional and managerial employees were rated using a five-level scheme in ascending order as follows: "unsatisfactory," "meets some expectations," "meets expectations," "above expectations," and "outstanding."

The defendants state that Chapman received less than a "meets expectations" in several categories in his August 1989 review.

**2.** AIGCS was formerly known as American International Adjustment Company. For simplicity, we will use the name AIGCS throughout our opinion.

viewed Chapman, was not impressed and thought AIGCS should look further, but recommended that Wogsland talk to Chapman himself. Chapman testified, however, that Wogsland interviewed him before Turnquist did. At the time of the interviews, Chapman was 61 years old.

Later that month, Chapman was informed that AIGCS would not be hiring him. Among the employees eventually hired by AIGCS for some position were four other AI Transport employees. Graham Wiggins was hired as the Casualty Claims Manager; Warren Jones was hired as the Complex Claims Director; Duane Sevillian was hired as the Fast Track Manager; and Ernest John Smith was hired as a Casualty Claims Representative. Two of the four were over forty years old, but all four were younger than Chapman.[3]

On December 18, 1992, Chapman was terminated by AI Transport because of his refusal to travel, which he claimed to be the result of a heart condition. The facts relating to that condition and Chapman's termination by AI Transport are accurately summarized in the panel opinion. *See Chapman*, 180 F.3d at 1247–48. We will not set out in this opinion all of those facts, because they are not relevant to the ADEA claims which arose from AIGCS's failure to hire Chapman while he was still working at AI Transport.

## II. PROCEDURAL HISTORY

### A. *Complaint*

In June 1994, after having exhausted his EEOC administrative remedies, Chapman filed a lawsuit in federal district court against the defendants. His complaint included claims of age discrimination in violation of the ADEA, 29 U.S.C. §§ 621–34, and disability discrimination in violation of the ADA, 42 U.S.C. §§ 12101–17.[4] His complaint set out his allegations of age discrimination as follows:

25. During September or October of 1992, a claims supervisor position came open in the Atlanta Service Center of [AIGCS]. Mr. Chapman was qualified to perform this position, which would have required no out-of-town travel on business.

26. Mr. Chapman went through the proper procedures to apply for the open position at [AIGCS]. The [AIGCS] employee who interviewed Mr. Chapman for the position, James Wogsland (Vice President of [AIGCS] in Atlanta), informed Mr. Chapman that he would rely upon Mr. Spann's assessment of Mr. Chapman's work in making his decision.

27. The position at [AIGCS] for which Mr. Chapman applied was awarded to Mr. Graham Wiggins, black. Mr. Wiggins was less qualified than Mr. Chapman for the position, had no physical disability and was much younger than Mr. Chapman.

28. AI Transport also transferred Mr. Warren Jones and Mr. Duane Sevillian to [AIGCS] to perform positions that Mr. Chapman was more qualified to perform. Mr. Jones and Mr. Sevillian are black, are not physically disabled, and are much younger than Mr. Chapman.

### B. *Motions for Summary Judgment*

On April 29, 1996, Chapman moved for partial summary judgment on his disability

3. Smith was 50 years old, Wiggins was 47 years old, Sevillian was 39 years old, and Jones was 37.

4. Chapman also brought claims of race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 *et seq.*, and salary discrimination in violation of the ADA, ADEA, Title VII, and 42 U.S.C. § 1981. The district court awarded summary judgment to AIGCS, AIG and AI Transport on the race discrimination claims and to AIG and AI Transport on the salary discrimination claims based on the ADA, ADEA and Title VII. The court denied summary judgment as to the claims of salary discrimination in violation of § 1981. The district court entered a Rule 50(a) dismissal of the salary discrimination claim at the close of the evidence in the trial. The race and salary discrimination claims are not at issue on appeal and we will not discuss them further.

discrimination claims. Included in the Statement of Undisputed Material Facts submitted by Chapman with his motion for partial summary judgment were the following statements:

25. Mr. Chapman applied for any open positions, including Complex Claims Director, Fast Track Manager, Casualty Claims Manager, and Casualty Claims Representative. According to the AIGCS managers responsible for supervising and filling these positions, Mr. Chapman was qualified for all of them. None of these positions required business travel.

26. Nevertheless, instead of transferring Mr. Chapman to one of these open positions, which would have fully accommodated his disability, Defendants filled the positions with other non-disabled individuals from AI Transport. Graham Wiggins was placed in the Casualty Claims Manager position; Warren Jones was placed in the Complex Claims Director position; Duane Sevillian (a claims representative at AI Transport) was placed in the Fast Track Manager position and Ernest John Smith (a claims representative at AI Transport) was placed in the Casualty Claims Representative position.... Chapman was more qualified than these other candidates.

On April 30, 1996, AI Transport, AIG Aviation and AIG moved for summary judgment on all claims. AIGCS and AIG filed a separate motion for summary judgment on all claims. In the Statement of Material Facts attached to its summary judgment motion, AIGCS stated that Wogsland and Turnquist, the two AIGCS vice presidents who interviewed Chapman, chose Wiggins over Chapman because of Chapman's poor interview and their concern "about [his] stability in light of the number of jobs he had held in a short period of time." [5]

In depositions attached as exhibits to the summary judgment motion, Wogsland and Turnquist explained their reasoning. Turnquist stated that he "had some concerns about [Chapman's] career path" and that "there was (sic) quite a few jobs after the Home [Insurance Company] and before he came to [his current employer]." In his mind, Turnquist questioned "what necessitated making as many and as frequent a job change during what ... was a fairly short period of time...." Turnquist also described what he said to Wogsland after his interview with Chapman as follows:

5. AIGCS's Memorandum in Support of [its] Motion for Summary Judgment reads as follows:

> The evidence belies Plaintiff's allegations that he was not hired by AIGCS because of his age. Turnquist and Wogsland both testified that they selected Wiggins over Plaintiff because Plaintiff interviewed poorly and because they were concerned about Plaintiff's stability in light of the number of jobs he had held in a short period of time (Turnquist at 64, 78–79; Wogsland at 102–08, 111). Plaintiff offered no evidence to rebut these reasons. Instead, he argues that Turnquist's notes were evidence of discrimination and that he was better qualified than Wiggins.
>
> AIGCS's Statement of Material Facts as to Which There is no Genuine Issue to be Tried, filed in support of its motion for summary judgment, reads as follows:
> 9. Plaintiff interviewed with [James] Wogsland, [the Vice President in charge of AIGCS's Atlanta office] and Ward Turnquist, Vice President of AIGCS's Complex Claims Unit, who were responsible for filling the position....
> 13. In his interview, Turnquist, as he did with other candidates he interviewed, questioned Plaintiff regarding when he received degrees and switched jobs to ascertain continuity of and stability in employment....
> 14. Plaintiff was not hired....
> 15. Graham Wiggins, a black Claims Supervisor at Transport, was hired for this position....
> 17. Turnquist and Wogsland both testified that they selected Wiggins over Plaintiff because they "didn't get a real feeling of confidence from" Plaintiff, because Wiggins made a "better presentation" than Plaintiff, and because Plaintiff did not give "sharp and concise" answers to their questions....
> 18. They were also concerned about Plaintiff's stability in light of the number of jobs he had held in a short period of time....

I didn't get a real feeling of confidence from [Chapman]—from my interview with [Chapman] and that I thought we could do better and that he should continue the interview process with other people. But I think I told [Wogsland]— I believe I did tell [him] that I think you need to talk to [Chapman] yourself.

Turnquist stated that he "thought that Graham Wiggins made a better presentation of himself and his skills. His knowledge skills and abilities and thought that he would have—he seemed to exhibit. I just had ... more confidence in Graham in the way he presented his work history."[6]

Wogsland shared Turnquist's concerns, testifying in deposition that he looked for "stability with a company and a progression within a particular company" and that "[w]e did not see that in those three positions between when [Chapman] left Home [Insurance Company] and AI Transport."

Wogsland further recounted that:

Within the interview that I conducted with [Chapman], it was basically that he was not very concise with the answers.

He did not take an aggressive approach in asking me questions about the position, where we were going. His answers were not very sharp, to the point, when I asked them, which basically were the same comments that [Turnquist] gave me about his interview [with Chapman].

When asked for an example of a question to which he received an unsatisfactory answer, Wogsland explained that "[Chapman] wasn't very clear about why he had gone from Home [Insurance Company] to several other positions before he got to Transport...."

Chapman responded to the defendants' motions. Chapman disputed AIGCS's allegation that he was not hired because of his recent job instability by arguing that he "had established a record as evidenced by his performance appraisals which were a more immediate indication of his stability," and arguing that "he continued to work on files for J. Gordon Gaines while working for three different employers between the time he left Home Insurance (after 16 years) and joined AI Transport."[7] Chap-

6. Turnquist's deposition as attached to Chapman's response to AIGCS's motion for summary judgment contained pages not attached as an exhibit to AIGCS's motion. In those pages, Turnquist related the following:

I didn't feel that John [Chapman] came into the interview to sell himself and his knowledge, skills and abilities for the position that I was interviewing for. Everybody does it a little differently I realize, but I didn't get a real strong feeling that this was somebody that was going to be able to be the leader of this unit. I didn't feel that he was the—he had all the things that we were look[ing] for in terms of being able to build confidence in a group of people, so that he could be the leader of that group of people.... Two and a half years later—you know—the only thing that I can recall quite frankly is that general overall impressions that I had of the interview with John and I do specifically recall the comments that I made to Jim [Wogsland] after I interviewed him. But I cannot recall in detail the specific comments that he made to questions that I might has (sic) asked or the specific detail he might have offered regarding his job history, but I reached the conclusion on the basis of my interview with John that we could do better I felt than John.

7. The pertinent portions of AIGCS's Statement of Material Facts as to Which There is no Genuine Issue to be Tried are quoted *supra* note 5. Chapman's Response to those parts of that statement reads as follows:

9. Plaintiff does not dispute.
13. Plaintiff disputes the factual allegation in ¶ 13. Defendants mischaracterize Plaintiff's testimony. Plaintiff's interview with Turnquist did not require asking questions to which Turnquist either already had answers or did not need those answers. Turnquist had Plaintiff's file which included a resume. Continuity and stability of employment was a pretext for intentional discrimination. (Chapman Dep., pp. 259, 260) Moreover, Wiggins and Chapman both worked for a total of six other employers before applying for transfers to AIAC and Turnquist did not inquire or question Wiggins' "stability." (Wiggins Dep., pp. 15–25; Wogsland Dep., p. 138)
14. Plaintiff disputes the factual allegation in ¶ 14 to the extent that Plaintiff was already an employee. Rather, Plaintiff was not transferred. (Plaintiff's Exhibit 132)
15. Plaintiff disputes the factual allegation in ¶ 15 to the extent that Graham Wiggins

man also compared his entire employment history to Wiggins' employment history and alleged that "it is undisputed that both Mr. Chapman and Wiggins worked for a total of six other employers ..." throughout their entire careers.[8]

Chapman responded to AIGCS's allegation that he was not hired based on a poor interview by contending that "this testimony [was] pretext for intentional discrimination."[9] Chapman did not refute Wogsland and Turnquist's evaluation of his interview.

He did not contend that he asked a lot of questions during the interview, gave concise answers, or otherwise interviewed well. Instead, Chapman argued that there was "limited probative value of [Wogsland and Turnquist's] opinions about Mr. Chapman's appearance and demeanor...." Neither Chapman's affidavit nor the excerpts from his deposition that were attached as exhibits to his summary judgment response set out a different version of the interview.[10]

---

was already an employee. Rather, Wiggins was transferred. (Plaintiff's Exhibit 81)

17. Plaintiff does not dispute but Plaintiff contends that this testimony is pretext for intentional discrimination.

18. Plaintiff disputes the factual allegation in ¶ 18 to the extent that Plaintiff already had been working at AIG for more than three years and was actually an employee asking for a transfer. Plaintiff had established a record as evidenced by his performance appraisals which were a more immediate indication of his stability. (Chapman Dep. I, pp. 254,; Defendants' Exhibits 74, 77, 78, 80, 81; Wogsland Dep., p. 111) Moreover, Mr. Chapman explained to Mr. Wogsland that he continued to work on files for J. Gordon Gaines while working for three different employers between the time he left Home Insurance (after 16 years) and joined AI Transport. (Chapman Aff. ¶ 4–6; Wogsland Dep., pp. 142–45.)

8. Chapman's Response to AIGCS's Motion for Summary Judgment reads as follows:

The only alleged legitimate reason offered by Defendants for selecting Wiggins instead of Mr. Chapman was the claimed subjective opinion of Turnquist and Wogsland (after interviewing Mr. Chapman and Wiggins) that they "didn't get a real feeling of confidence from" Mr. Chapman; Wiggins made a "better presentation," and Mr. Chapman did not give "sharp and concise" answers. Turnquist and Wogsland also claim they were concerned about Plaintiff's stability in light of the number of jobs he had held.

Aside from the limited probative value of their opinions about Mr. Chapman's appearance and demeanor, the record suggests that Turnquist's and Wogsland's reliance on the "stability" factor was a pretext for intentional discrimination. It is undisputed that, although Mr. Chapman worked for three employers between the time he left Home Insurance (after 16 years) and joined

AI Transport, he continued to work on files for J. Gordon Gaines for all three of those employers. Thus, rather than indicating a lack of stability, Mr. Chapman's interim employment demonstrated the customer's preference for his continued handling of its claims as it changed insurers—a factor which reflects favorably on his performance in the industry. Mr. Chapman explained this continued relationship with J. Gordon Gaines during his interview with Wogsland and in fact, Wogsland wrote "Gaines" in his notes of the interview. Moreover, in further contradiction of the alleged focus on lack of stability in Mr. Chapman's employment background, it is undisputed that both Mr. Chapman and Wiggins worked for a total of six other employers before interviewing at [AIGCS].

Chapman's Response to AIGCS's Statement of Material Facts as to Which There is no Genuine Issue to be Tried contains similar statements in paragraphs 13 and 18. *See supra* note 7.

9. AIGCS's Statement of Material Facts as to Which There is no Genuine Issue to be Tried, filed in support of its motion for summary judgment, asserted that: "Turnquist and Wogsland both testified that they selected Wiggins over Plaintiff because they 'didn't get a real feeling of confidence from' Plaintiff, because Wiggins made a 'better presentation' than Plaintiff, and because Plaintiff did not give 'sharp and concise' answers to their questions...."

Chapman's response reads as follows: "Plaintiff does not dispute but Plaintiff contends that this testimony is pretext for intentional discrimination."

10. The dissenting opinion says that the summary judgment record contains "evidence tending to show" that Chapman gave reasons for every job move that he had made. But the reasons that opinion cites are drawn from the explanations for those moves that Chap-

## C. *Magistrate Judge's Report and District Court Order*

In August 1996, the magistrate judge issued his report and recommendation. With respect to the age discrimination claims, the report recommended that AIGCS's motion for summary judgment be denied. The report stated that Chapman's evidence about his overall employment record and continuity of work on J. Gordon Gaines' files cast doubt on AIGCS's proffered nondiscriminatory reason of job instability. The report also stated that AIGCS's other proffered reason, Chapman's poor interview, was subjective and for that reason was an inappropriate basis upon which to award summary judgment.

On March 5, 1997, the district court issued an order granting summary judgment in favor of the defendants on Chapman's ADEA claims, but denying summary judgment on the ADA claims. With respect to the ADEA claims, the district court held that Chapman did not present sufficient evidence for a reasonable factfinder to conclude that the second proffered reason, his poor interview, was pretextual. Having so held, the district court found it unnecessary to address AIGCS's first reason, Chapman's recent job instability. With respect to the ADA claims, the court concluded that there were genuine issues of material fact including whether Chapman was disabled and whether travel was an essential function of his job. Accordingly, the court denied summary judgment on the ADA claims, leaving them to be decided at trial.

## D. *Post–Summary Judgment Events and Trial*

Before trial of the ADA claims, the defendants moved in limine to exclude a position statement AIG prepared for submission to the EEOC as part of the conciliation process. That position statement described Chapman's transfer to the position of SIR Manager as a promotion. The defendants later admitted that the transfer was actually a lateral move. Esther Kornblau, AIG's Director of Employee Relations in New York City, wrote the position statement and Valerie Zaleski, the human resources manager for AI Transport, checked it in Atlanta. Bill O'Brien, the vice president in charge of claims operations at AI Transport, either read it or had it read to him and did not point out any mistakes. Spann, Chapman's immediate supervisor, also probably reviewed the statement, and he did not point out any mistakes either.

The district court granted the defendants' motion in limine. At trial, however, the court allowed Chapman to introduce most of the position statement into evidence as an exhibit but not the part of it which characterized Chapman's transfer as a promotion. The court required Chapman to redact that part of the position statement. Chapman's ADA claims were tried before a jury from June 17 to June 30, 1997. The jury returned a verdict in favor of the defendants.

On July 2, 1997, Chapman filed a motion to reconsider and vacate summary judgment on his ADEA claims. He argued that evidence adduced immediately prior to and at the trial of his ADA claims established a genuine issue of material fact about whether AIGCS's proffered nondiscriminatory reasons regarding his ADEA claims were pretextual, thereby requiring a jury trial. Chapman also filed a timely motion for a new trial on the ADA claims. He argued, among other things, that the court had erred by redacting from the

man gave after the lawsuit was filed, not during the interviews. Nowhere in Chapman's depositions does he contradict Wogsland's testimony that "[h]is answers were not very sharp, to the point, when I asked them, which basically were the same comments that [Turnquist] gave me about his interview."

Nor did Chapman ever put forward any testimony or other evidence to contradict Wogsland's testimony that during the interview "[Chapman] wasn't very clear about why he had gone from Home [Insurance Company] to several other positions before he got to Transport...."

position statement the defendants' false characterization of his transfer. The district court denied both motions. Thereafter, the court awarded costs to the defendants. Chapman appealed the grant of summary judgment on the ADEA claims, the jury verdict on the ADA claims, the district court's denial of his post-trial motions, and the award of costs to the defendants.

### E. *Panel Opinion*

A panel of this Court issued a decision affirming in part and reversing in part. *See Chapman v. AI Transport,* 180 F.3d 1244 (11th Cir.1999). Addressing the award of summary judgment on the ADEA claims, the panel concluded that the district court did not "properly evaluate Chapman's effort to demonstrate the pretextual nature of AIGCS's reason for its employment decision...." *Id.* at 1249. The panel decided that the fact that Chapman worked for six different companies over a thirty-five year period and the fact that he had done work primarily involving one client during the recent three-year period in which he worked for three employers raised a genuine issue of material fact as to whether AIGCS's objective reason, Chapman's recent job instability, was a pretext for age discrimination. *See id.* at 1250. The panel stated that those facts were also sufficient at the summary judgment stage to cast doubt on AIGCS's subjective reason, Chapman's poor interview, even though that evidence did not directly rebut AIGCS's assessment of his interview. *See id.* For those reasons, the panel reversed the district court's grant of summary judgment and remanded for further proceedings on that issue. *See id.* at 1250–51, 1254.

With respect to the ADA claims, the panel concluded that there was sufficient evidence for a reasonable jury to find in favor of the defendants and affirmed the jury's verdict. *See id.* at 1251. Although believing that the district court had abused its discretion by excluding from evidence the false description of Chapman's transfer as a promotion in the position statement the defendants filed with the EEOC, the panel concluded that the error was harmless. *See id.* at 1252. Finally, the panel vacated the district court's award of costs to the defendants, because the "district court incorrectly concluded that it lacked the authority to consider Chapman's financial status as a factor in calculating the total costs awarded to the defendants." *Id.* at 1253.

## III. STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, applying the same legal standards as the district court. *See Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1313 (11th Cir.1999). Under Federal Rule of Civil Procedure 56(c):

[s]ummary judgment is appropriate if the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995) (internal marks and citations omitted). We review the district court's exclusion of evidence, award of costs and denial of a motion to reconsider summary judgment only for abuse of discretion. *See Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1554 (11th Cir.1995) (exclusion of evidence); *Technical Resource Servs. v. Dornier Medical*

*Sys., Inc.,* 134 F.3d 1458, 1468 (11th Cir. 1998) (costs); *Cavaliere v. Allstate Ins. Co.,* 996 F.2d 1111, 1115 (11th Cir.1993) (Rule 60 motion to reconsider).

## IV. DISCUSSION

### A. *Summary Judgment on Chapman's ADEA Claims*

1. The Applicable Legal Framework

■ The ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). As the Supreme Court has stated:

> [w]hen a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. That is, the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.

*Reeves v. Sanderson Plumbing Products, Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (internal marks and citations omitted).

■ This Court, as well as other federal courts of appeals, uses the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to evaluate ADEA claims that are based upon circumstantial evidence of discrimination. *See Reeves,* 120 S.Ct. at 2105 (noting widespread use of the *McDonnell Douglas* framework in ADEA cases and assuming its applicability); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527–28 (11th Cir.1997). Under that framework, the plaintiff must first establish a prima facie case of discrimination. *See Combs,* 106 F.3d at 1527–28 (citations omitted).

One method a plaintiff can use to establish a prima facie case for an ADEA violation is by showing that he (1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual. *See Benson v. Tocco, Inc.,* 113 F.3d 1203, 1207–08 (11th Cir. 1997).

> Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

*Combs,* 106 F.3d at 1528 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094 (footnote omitted)).

■ If a plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate a legitimate, non-discriminatory reason for the challenged employment action. *See id.* However, the employer's burden is merely one of production; it "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* at 1528 (quoting *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094 (citation and footnote omitted)).

■ If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* (citations omitted). If the plaintiff does not proffer sufficient evidence to create a genuine issue of material

fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim. *See id.* at 1529 (holding that there must be "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action").[11]

A final note is in order about the law applicable to summary judgment in job discrimination cases. Some of our opinions from past years purport to announce "[a]s a general rule [that] summary judgment is not a proper vehicle for resolving claims of employment discrimination which often turn on an employer's motivation and intent." *E.g., Delgado v. Lockheed–Georgia Co.,* 815 F.2d 641, 644 (11th Cir.1987); *accord Batey v. Stone,* 24 F.3d 1330, 1336 (11th Cir.1994) ("summary judgment in

employment discrimination cases ... is especially questionable" (internal quotation and citation omitted)). There is some question about whether that supposed rule was ever followed, *see Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990) ("Summary judgments for defendants are not rare in employment discrimination cases.") (citing cases), but no question that it has not been followed in recent years. As the Seventh Circuit has observed, "Summary judgment is hardly unknown, or for that matter rare, in employment discrimination cases, more than 90 percent of which are resolved before trial, ... many of them on the basis of summary judgment for the defendant." *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir.1997) (citations omitted); *see also* Lewis Maltby, *Employment Arbitration: Is it Really Second Class Justice?,*

**11.** Although the defendant is entitled to summary judgment in its favor if the plaintiff does *not* proffer sufficient evidence of pretext, the converse is not necessarily true. If the plaintiff does proffer sufficient evidence that the defendant's stated reasons are pretextual, the plaintiff still may not be entitled to take his case to a jury. In *Reeves,* which dealt with Rule 50, judgment as a matter of law, the Supreme Court stated:

> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred....
>
> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those in-

clude the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law....

*Reeves,* 120 S.Ct. at 2109.

The *Reeves* case involved a judgment as a matter of law under Rule 50, and not summary judgment under Rule 56. But the Supreme Court said that, although the evidence considered when a district court rules upon a motion for judgment as a matter of law is different from the evidence considered when the court rules upon a summary judgment motion, the "standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." *Id.* at 2110 (quotations and citations omitted).

The Supreme Court's decision in *Reeves* modifies part of our *Combs*-decision. We had stated in *Combs* that judgment as a matter of law was unavailable to an employer once a plaintiff offered sufficient evidence of pretext as to each of the proffered reasons. *Combs,* 106 F.3d at 1538. As we have just explained, *Reeves* tells us judgment as a matter of law will sometimes be available to an employer in such a case. *Reeves,* 120 S.Ct. at 2109. And, because the "standard for granting summary judgment mirrors the standard for granting judgment as a matter of law, such that the inquiry under each is the same," *id.* at 2110, the same is true of summary judgment.

Disp. Resol. Mag., Fall 1999, at 23–24 (footnote omitted) ("In fact, the majority of employment cases, some 60 percent, are resolved by summary judgment."); *see generally* Administrative Office of the U.S. Courts, *Judicial Business of the United States Courts: 1999 Report of the Director*, p. 160–62 (indicating, from figures in Table C–4, that 94.09% of employment civil rights cases are resolved before trial).

While acknowledging that questions of fact in job discrimination cases are "both sensitive and difficult" and "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes," the Supreme Court has told us that "none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407 (1993) (quoting *Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)). And quite recently, the Court rejected a rule which would have made it easier for job discrimination plaintiffs to get their case to a jury, explaining that "[t]o hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." *Reeves*, 120 S.Ct. at 2109 (internal quotation and citation omitted). The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale.

### 2. The Evidence We Consider in Reviewing a Grant of Summary Judgment

On March 5, 1997, the district court granted summary judgment in favor of the defendants on Chapman's ADEA claims but denied summary judgment on the ADA claims. On July 2, 1997, after the jury had returned its verdict against Chapman at the trial of the ADA claims, he filed a motion requesting the court to reconsider and vacate summary judgment on the ADEA claims. Chapman argued in his motion that evidence adduced immediately prior to and at the trial of his ADA claims created a genuine issue of material fact as to whether AIGCS's proffered nondiscriminatory reasons regarding his ADEA claims were pretextual. The district court denied Chapman's motion to reconsider and vacate, leaving intact the summary judgment previously entered on the ADEA claims. Chapman contends that the trial testimony demonstrates that the district court's grant of summary judgment on the ADEA claims was erroneous, and his en banc brief to this Court relies extensively upon trial testimony in arguing that we should reverse summary judgment. By our count, the brief's "Statement of the Facts" section contains sixty-seven citations to trial testimony and only one citation to the summary judgment record.

There are two closely related issues here. One is whether the district court abused its discretion in not re-opening summary judgment on the ADEA claims after the trial of the ADA claims based upon evidence that came out shortly before and during that trial. The other issue is whether we should consider that later evidence in reviewing the district court's decision to grant summary judgment on the ADEA claims. The two issues are inextricably intertwined and they require a consistent answer. If the district court did not abuse its discretion in failing to re-open summary judgment on the ADEA claims, then we cannot consider the evidence that would have been available if the court had re-opened summary judgment.

The rule is that "a federal appellate court may examine *only* the evidence which was before the district court when the latter decided the motion for summary judgment." *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 n. 3 (11th Cir. 1992) (citations omitted) (emphasis added); *see also* 10A Charles Alan Wright et al.,

Federal Practice and Procedure § 2716 (3rd ed. 1998) ("The appellate court is limited in its review.... [I]t can consider only those papers that were before the trial court. The parties cannot add exhibits, depositions, or affidavits to support their position."). The Tenth Circuit elaborated on the rule in *United States v. Hardage*, 982 F.2d 1436 (10th Cir.1992), stating that:

> [n]either the evidence offered subsequently at the trial nor the verdict is relevant. One who loses on summary judgment cannot give a retroactive effect to a trial verdict, using it in an effort to create a genuine issue of material fact at the time the court was considering the motion for summary judgment.

*Id.* at 1444 (internal quotations and citations omitted). This universally followed rule is indispensable to the orderly processing of cases in the district courts.

We have frequently railed about the evils of shotgun pleadings and urged district courts to take a firm hand and whittle cases down to the few triable claims, casting aside the many non-triable ones through dismissals where there is failure to state a claim and through summary judgment where there is no genuine issue of material fact. *See, e.g., Morro v. City of Birmingham*, 117 F.3d 508, 515 (11th Cir. 1997) (explaining that "[t]he use of shotgun pleadings in civil cases is a ubiquitous problem," and "[g]iven the seriousness of that problem, it is particularly important for the district courts to undertake the difficult, but essential, task of attempting to narrow and define the issues before trial." (internal quotation and citation omitted)). It would seriously impair the ability of district courts to pare down the issues in multi-claim civil cases if we required them to revisit and re-evaluate a summary judgment previously granted on one claim because of evidence that comes out later at the trial of other claims.

Moreover, the approach Chapman would have us follow would burden our already heavily burdened district courts with multiple trials in a single case where one should suffice. To vacate summary judgment on one claim after the trial of another claim would necessarily result in two trials instead of one. Indeed, that is precisely what Chapman's motion to reconsider and vacate requested. There is no good reason for inflicting that burden of multiple trials upon our system with its finite resources. Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards.

 The district court did not abuse its discretion in refusing to re-open after the trial of the ADA claims the summary judgment it had previously granted in favor of the defendants on the ADEA claims. And because the district court did not have the testimony from the trial of the ADA claims before it when it granted summary judgment in favor of the defendants on the ADEA claims, any evidence offered at trial is not relevant to our review of the ADEA summary judgment and we will not consider it. *See U.S. East Telecomm., Inc. v. U.S. West Communications Servs., Inc.*, 38 F.3d 1289, 1301 (2nd Cir.1994); *Hardage*, 982 F.2d at 1444–45; *Nissho–Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988); *Voutour v. Vitale*, 761 F.2d 812, 817 (1st Cir.1985).[12]

---

12. We recognize that Federal Rule of Civil Procedure 60(b), upon which Chapman based his motion, allows a district court to relieve a party from a final judgment under circumstances that include "mistake, inadvertence, surprise, or excusable neglect," "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial," "fraud, ... misrepresentation, or other misconduct of an adverse party," or "any other reason justifying relief...." Fed.R.Civ.P. 60(b). Despite Chapman's assertions to the contrary, his proffered evidence fits none of the grounds for relief explicitly described in Rule 60(b), and as we have discussed above, trial evidence on one issue is not a "reason justifying relief" from

### 3. AIGCS's Proffered Nondiscriminatory Reasons

It is undisputed that Chapman established his prima facie case. He was sixty-one years old at the time that he applied, but was not hired, for a job at AIGCS. He was qualified for at least one of the positions for which he applied, Casualty Claims Manager. Four individuals who accepted jobs for which Chapman had applied, including the position of Casualty Claims Manager, were younger than him. Applying the *McDonnell Douglas* framework, because Chapman met his burden of establishing a prima facie case, a presumption of discrimination arose and the burden shifted to AIGCS to proffer a legitimate, nondiscriminatory reason for not hiring Chapman.[13] *See Combs,* 106 F.3d at 1527–28. To meet that burden, which is only a burden of production, AIGCS in its motion for summary judgment proffered two legitimate, nondiscriminatory reasons, one of which was objective and the other subjective. The objective reason as stated by Turnquist and Wogsland, the decision makers for the positions for which Chapman applied, was Chapman's lack of "stability in light of the number of jobs he had held in a short period of time." The subjective reason, stated by those same decisionmakers, was Chapman's poor interview.[14]

AIGCS's proffer of those nondiscriminatory reasons eliminated the presumption of discrimination, thereby shifting the burden to Chapman to come forward with sufficient evidence to permit a reasonable factfinder to find that those reasons were pretextual. *See Combs,* 106 F.3d at 1528. We will discuss each of AIGCS's proffered reasons and Chapman's attempted showing of pretext as to that reason separately.

#### a. Chapman's Record of Recent Job Instability

AIGCS articulated its objective reason for not hiring Chapman as follows: "[Ward Turnquist and James Wogsland, the two vice-presidents who interviewed Chapman,] were concerned about [his] stability in light of the number of jobs he had held in a short period of time."[15] Turn-

---

an earlier summary judgment on another issue.

**13.** Chapman presented little or no statistical evidence in the district court that AIGCS discriminated against older applicants, that is, the members of the protected class. According to AIGCS's calculations, of the 110 people hired in 1992 (the year in which Chapman was turned down), almost forty percent were over forty years old. Unable to make his case with statistics, Chapman instead relied upon circumstantial evidence. Therefore, we use the *McDonnell Douglas* framework to analyze his claims. *See Combs,* 106 F.3d at 1527–28.

**14.** There is some ambiguity in the record about exactly what role Turnquist had in the decisionmaking. Chapman's complaint and early submissions to the district court only mention his interview with Wogsland and do not mention Turnquist, but Chapman did not allege that Wogsland was the only decisionmaker or that Turnquist was uninvolved. The position statement the defendants filed with the EEOC refers only to Turnquist interviewing Chapman and not to Wogsland. Wogsland testified in deposition that he hired Wiggins, Sevillian and Smith, and that Turnquist

hired Jones. Turnquist testified in his deposition that he screened candidates for Wogsland and that he interviewed Chapman. Chapman and the defendants did refer to both Wogsland and Turnquist as decisionmakers numerous times in the district court and in their briefs to this Court. Also, it is undisputed that both of them interviewed Chapman and each had input into the hiring decisions. Notwithstanding all of this, Chapman's en banc brief to this Court also states, "Wogsland was the selecting official."

Viewing the evidence in the light most favorable to Chapman, we accept what we understand to be his current position: that Wogsland and Turnquist were both decisionmakers in regard to his employment application in the sense that each had input, although Wogsland made the final call.

**15.** AIGCS's Memorandum in Support of [its] Motion for Summary Judgment reads as follows:

The evidence belies Plaintiff's allegations that he was not hired by AIGCS because of his age. Turnquist and Wogsland both testified that they selected Wiggins over Plaintiff because Plaintiff interviewed poorly and

quist explained his position more thoroughly in his deposition, stating that he "had some concerns about [Chapman's] career path" and that "there [were] quite a few jobs after the Home [Insurance Company] and before he came to [his current employer]." That bothered Turnquist, who questioned "what necessitated making as many and as frequent a job change during what . . . was a fairly short period of time. . . ." Notes from Turnquist's interview with Chapman corroborate his concern. In those notes, Turnquist listed Chapman's employers and the dates Chapman left each employer.

Wogsland expressed similar sentiments in his deposition. He stated:

> The question was basically when you look at a resume and look at why somebody left somewhere you look for stability in a position, stability with a company and a progression within a particular company or if they have left a position for growth opportunities. We did not see that in those three positions between when he left Home [Insurance Company] and AI Transport.

Wogsland asked Chapman during the interview about the various jobs Chapman had between Home Insurance Company and AI Transport, but Chapman "wasn't very clear about why he had gone from Home to several other positions before he got to Transport. . . ."

In response to AIGCS's articulated reason, Chapman asserted that he "had established a record as evidenced by his performance appraisals which were a more immediate indication of his stability," and that "he continued to work on files for J. Gordon Gaines while working for [the]

> because they were concerned about Plaintiff's stability in light of the number of jobs he had held in a short period of time. . . .

16. Chapman's reliance on his continued work on the Gaines account as an explanation for his job skipping may be unfounded. It appears from Wogsland's interview notes and Chapman's affidavit that although Chapman continued working on files for Gaines, the files upon which he worked were different at

three different employers between the time he left Home Insurance (after 16 years) and joined AI Transport." Chapman also argued that Wiggins, who was selected instead of him as Casualty Claims Manager, had worked for a total of six other employers during his entire career (which spanned twenty-three years).

Chapman and Wiggins each went to work in 1988 for AI Transport, which was their employer when they applied for the Casualty Claims Manager position at AIGCS in 1992. Notably, Chapman did not dispute that he had worked for three different employers in the three years before he joined AI Transport in 1988. Nor did he dispute that Wiggins had worked for only one employer in the ten years before Wiggins joined AI Transport in that same year.

Chapman's assertions about his good performance and continued work on the Gaines account may be true, but the reason AIGCS proffered for not hiring Chapman was the number of times he had changed employers in a specified short period of time (between leaving Home Insurance in 1985 and going to AI Transport in 1998), not his performance appraisals and not the number of clients he had been involved with as he switched from one employer to another.[16] And while it may be true that both Chapman and Wiggins had worked for a total of six other employers during their entire careers, AIGCS's proffered nondiscriminatory reason was not the number of employers for which Chapman had ever worked. It was the number of times Chapman had changed employers in a specified period.[17]

each employer. However, it is unnecessary for us to decide whether Chapman's explanation is persuasive because, as discussed above, that explanation does not meet the reason proffered by AIGCS.

17. Turnquist did say in his deposition that he also looked at an applicant's entire work history, and recognized that there were commendable parts of Chapman's history. He also indicated that his concerns went beyond

A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. *See Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir.2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Combs,* 106 F.3d at 1541–43.[18] We have recognized previously and we reiterate today that:

> [f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited

to whether the employer gave an honest explanation of its behavior."

*Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted)); *see also Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Abel v. Dubberly,* 210 F.3d 1334, 1339 n. 5 (11th Cir.2000). We "do not ... second-guess the business judgment of employers." *Combs,* 106 F.3d at 1543; *accord Alexander,* 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair." (internal citation omitted)).[19]

> "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer." *Id.* Accordingly, we held that the plaintiff had not presented sufficient evidence for a factfinder to conclude the employer's reason was pretextual, and we reversed the district court's denial of the employer's motion for judgment as a matter of law. *See id.*

---

18. the job switching during the period between Home Insurance and AI Transport, saying that he was concerned "[n]ot necessarily just [with] that time frame." That is not inconsistent with the salient concern about job instability being, as Wogsland testified, the proffered one of the three job switches during the specified three-year period.

In *Combs,* the employer maintained that the superior supervisory experience of the person selected for the job was the reason that person was hired instead of the plaintiff. *See id.* at 1541–43. The plaintiff, in response, presented evidence that the person selected had been forced to resign from a prior position because of financial improprieties. *See id.* at 1543. We stated that "[f]inancial impropriety is a serious matter," but recognized that the employer's proffered nondiscriminatory reason was not financial probity, but supervisory experience, and that the employer was entitled to select the criteria upon which it based hiring decisions. *Id.*

As a result, we held in *Combs* that the undisputed evidence of the comparator's financial impropriety was not sufficient to create a genuine issue of pretext when the employer's proffered reason was the difference in supervisory experience. We explained that

19. Just as plaintiffs are not allowed to recast an employer's proffered reason, so also should courts refrain from doing so. Accordingly, we take the reason proffered by the employer at the time of summary judgment, the reason presented to the district court, and examine it. AIGCS's proffer, as particularized in the Wogsland and Turnquist depositions, focused on the 1985 to 1988 period, the three years between Chapman's departure from Home Insurance and his arrival at AI Transport. The dissenting opinion focuses instead on the thirteen-year period before Chapman arrived at AI Transport, but that is not the period proffered at the summary judgment stage as specified in the deposition of the two decision makers.

Here, the proffered reason clearly meets the test of being one that might motivate a reasonable employer. Indeed, leaving several employers in a recent and short period of time, or job-skipping, is an imminently reasonable basis upon which to choose between job applicants. As the Seventh Circuit has observed: "High turnover of skilled workers can be very harmful to a company. The worker who leaves may take with him trade secrets valuable to a competitor or the benefits of specialized training that the employer had given him, at some expense, in the hope of recouping the expense in the worker's superior productivity now to be enjoyed by another employer." *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000). Furthermore, it makes sense for an employer to be concerned about how often an applicant has changed employers in recent years, instead of his career total or average. An employer could reasonably conclude that a job applicant who has not stayed with any recent employer for very long is unlikely to stay with it for long, either, and that what the applicant will do in the near- and mid-range future is better predicted from recent behavior than from what happened ten or twenty years ago.[20]

Chapman's purported loyalty to one client of several of his employers does not do him any good in this analysis. An employer reasonably could be more concerned with an applicant's loyalty to employers than with his loyalty to clients. Indeed, we would be surprised if that were not the case. For that reason, it is altogether understandable why an employer might count the number of times a job applicant has changed employers instead of the number of different clients he has worked with at his various employers. In any event, even if we were to disagree with the wisdom of the hiring criterion used by AIGCS, it is not our role to decide how to run AIGCS's business or to dictate employment criteria to it.

AIGCS presented Chapman's job instability in light of the number of jobs he had held in a specified recent and short period of time as a legitimate, nondiscriminatory reason for not hiring him. The burden shifted to Chapman to produce sufficient evidence for a factfinder to conclude that this reason was a pretext for age discrimination. Chapman did not produce any such evidence. None of the evidence he offered rebutted AIGCS's articulated nondiscriminatory reason. Chapman's good performance appraisals indicate that he performed satisfactorily his job for his present employer. Chapman's continuous work on the Gaines account supposedly shows that he was loyal to that client and the client was pleased with his work. But those facts in no way undermine AIGCS's stated concern about Chapman's changing employers three times in a recent three-year period.[21]

---

**20.** It appears that Chapman may have shared AIGCS's opinion about what his job history showed. The resume that he submitted to AIGCS listed all of his employers, but gave not one date as to when he started or finished with any of them.

**21.** At oral argument, Chapman also contended that AIGCS's reliance on Chapman's having changed employers three times in three years as a legitimate, nondiscriminatory reason was implausible because any such concern must have been resolved when Chapman was hired by AI Transport in 1988. That contention is meritless. Different decisionmakers are entitled to be concerned about different things. Just as we will not dictate employment criteria to any company, we will

not require separate decisionmakers for different, albeit related, companies to use the same criteria. Spann hired Chapman into AI Transport in 1988. Wogsland and Turnquist interviewed Chapman in 1992 and chose not to hire him into AIGCS. Whether Spann considered Chapman's job-skipping and, if so, how he factored that shortcoming into his decision has no bearing on whether Wogsland and Turnquist reasonably could consider it. Besides, there is nothing in the record to show the job skipping history of anyone else who applied for the job Chapman got at AI Transport. For all we know, any other applicant for that position at AI Transport in 1988 had an even worse record of disloyalty to employers, or had some additional shortcoming.

Unable to knock down AIGCS's proffered reason of job instability by comparing himself to Wiggins, who was hired as the Casualty Claims Manager, Chapman has attempted on appeal to extend his comparison beyond Wiggins, contending that one of the other AI Transport employees—Earnest John Smith—who was hired by AIGCS in another position had an employment history similar to his own. However, this contention does not help Chapman. First, he did not make this argument in the district court; there, the only employee Chapman contended had an employment history similar to his own was Wiggins. *See Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1511 n. 30 (11th Cir.1996) ("As a general rule, we will not address claims or arguments not fairly presented to the district court." (citation omitted)).

Second, even if we were to consider the job history of Smith, Chapman would still have failed to create a genuine issue of pretext. AIGCS's concern was the number of times Chapman had changed jobs in a recent, short period of time. Smith had not changed employers as many times as Chapman had in as recent and short a period of time. Unlike Chapman, who had worked for three different employers in the three years before he joined AI Transport in 1988, Smith had only worked for two employers during that time period (and the first of those he had been with for six years, unlike Chapman who had been with his first one during that period for only one year).[22]

Our dissenting colleagues point to Sevillian and Jones, two other employees who were hired in other positions at AIGCS, and contend that they, too, had job instability records as bad or worse than Chapman. This is an argument Chapman himself did not make in the district court or in his panel or en banc briefs to this Court. We share Chapman's apparent conclusion

---

**22.** AIGCS has not been inconsistent about what it means by Chapman's "recent" history of job skipping. In its Memorandum in Support of Motion for Summary Judgment, AIGCS proffered Turnquist and Wogsland's concern "about Plaintiff's stability in light of the number of jobs he had held in a short period of time," not characterizing it as "recent." In his deposition, Turnquist further specified that concern about Chapman's job instability as "there was quite a few jobs after the Home [Insurance Company] and before he came to [his current employer]." Wogsland specified that same three-year period as the source of his concern, testifying in deposition that he had been looking for someone with job stability and progression within a company, and "We did not see that in those three positions between when he left Home [Insurance Company] and AI Transport."

The dissenting opinion suggests that Wogsland and Turnquist's concern with Chapman's job skipping during the three-year period between the time he left Home Insurance and went to AI Transport, which was from 1985 to 1988, is somehow inconsistent with Wogsland's statement in deposition that Chapman "had not had any recent general liability experience" (which was never proffered as a reason for not hiring him). The perceived inconsistency is apparently between the period Wogsland referred to as not "recent" for

purposes of Chapman's general liability experience, and Wogsland's use of the word "recent" at one point during his deposition to refer to Chapman's job skipping during what was approximately the same period of time in which Chapman did not have general liability experience.

We see no inconsistency, because there is no reason why what is recent for purposes of job skipping also must be defined as recent for purposes of a particular type of claims handling experience. The more fundamental point, however, is that the proffered reason was not "recent" job skipping—although that is how the panel opinion, this opinion, and the dissenting opinion have characterized it. The actual proffered reason, as specified in Wogsland and Turnquist's depositions, was job skipping during a particular short period of time, defined as the period from Chapman's departure from Home Insurance Company (in 1985) to his arrival at AI Transport (in 1988). Wogsland did at one point in his deposition apply the adjective "recent" to that period of time, but his doing so in no way detracts from the specificity of the period. And there is nothing vague or undefined about that specified period between the time Chapman left Home Insurance and the time he started work at AI Transport—regardless of whether one would call it "recent," "nearly recent," "pretty darn recent," or "mighty recent."

that this argument lacks merit. For one thing, Jones was hired by AIGCS after Chapman had been fired by AI Transport, and we do not think a reasonable jury could find discrimination in the failure of a company to hire an applicant recently fired by another company for insubordination, or one who had just left (yet again) one employer for another.[23] In any event, Jones did not have a recent history of job instability like Chapman. To the contrary, he had been with one employer during the period Chapman had been with three, and in fact had been with that one company since 1983. As for Sevillian, he had also been with only one employer during the period Chapman had been with three, and he had been with that employer since 1981.[24]

Because Chapman did not produce sufficient evidence for a reasonable factfinder to conclude that AIGCS's proffered non-discriminatory reason of recent job instability for declining to hire Chapman was a pretext for age discrimination, the defendants were entitled to summary judgment on the ADEA claims.

### b. Chapman's Interview

AIGCS articulated another reason for not hiring Chapman, his poor interview. Chapman asserts that Wogsland and Turnquist's assessment of his interview is not a legally sufficient reason to grant summary judgment for the defendants because of its subjective nature.

We begin with an important threshold point: A subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas/Burdine* analysis. Indeed, subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy. Take, for example, a job requiring continuing interaction with the public, such as a sales clerk or wait staff position. Attitude, articulateness, and enthusiasm, as well as appearance, can be vitally important in such a job, yet there are few if any ways to gauge such qualities objectively or from a written application. Interviews give prospective employers a chance to see if an applicant has the kind of personal qualities a service job requires and can be the best way an employer has to determine how a person interacts with others. Body language, tone of voice, eye contact, facial expressions and other non-verbal cues significantly affect the impression an applicant makes on the interviewer and will make on those whose business the company wants to attract or retain, but such things are hard to quantify and articulate with any precision and can only be evaluated subjectively.

Personal qualities also factor heavily into employment decisions concerning supervisory or professional positions. *See Sengupta v. Morrison–Knudsen Co.*, 804 F.2d 1072, 1075 (9th Cir.1986) (racial discrimination alleged in layoff from position as engineer) ("Indeed, in many situations [subjective criteria] are indispensable to the process...."); *Risher v. Aldridge,*

**23.** While there is no evidence that Turnquist knew at the time he hired Jones for the position of Complex Claims Director that Chapman had been fired by AI Transport for insubordination, Turnquist's undisputed deposition testimony was that he did not consider Chapman for the Complex Claims Director position because he heard that Chapman had left AI Transport and gone with another company.

**24.** It might appear to the casual reader that the historical facts concerning the job histories of Wiggins, Jones, Smith, and Sevillian that are set out in this opinion differ from those set out in the dissenting opinion. Not so. A careful review will reveal that the difference is in the period of time involved. We feel that the proper period of measurement is the time after Chapman left Home Insurance in 1985 until the time he joined AI Transport in 1988. That three-year period is the proper measurement because it is the one the decisionmakers used, the one proffered by AIGCS. As we have explained, neither plaintiffs nor courts are allowed to recast proffered reasons.

889 F.2d 592, 597 (5th Cir.1989) (sex discrimination alleged in failure to promote) ("Subjective criteria necessarily and legitimately enter into personnel decisions involving supervisory positions." (citation omitted)). Traits such as "common sense, good judgment, originality, ambition, loyalty, and tact" often must be assessed primarily in a subjective fashion, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988), yet they are essential to an individual's success in a supervisory or professional position. *See id.* at 999, 108 S.Ct. at 2791 ("It would be a most radical interpretation of Title VII for a court to enjoin use of an historically settled process and plainly relevant criteria largely because they lead to decisions which are difficult for a court to review.") (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 96 (2nd Cir.1984)).

It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation. *See Watson v. Ft. Worth Bank & Trust*, 487 U.S. at 999, 108 S.Ct. at 2791. To phrase it differently, subjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons.

 Nonetheless, we are mindful of the requirement articulated by the Supreme Court in *Burdine* that "the defendant's explanation of its legitimate reasons must be clear and reasonably specific" so that "the plaintiff be afforded a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096 (quotation omitted). A subjective reason

is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion. Continuing our example of a sales clerk or wait staff position, it might not be sufficient for a defendant employer to say it did not hire the plaintiff applicant simply because "I did not like his appearance" with no further explanation. However, if the defendant employer said, "I did not like his appearance because his hair was uncombed and he had dandruff all over his shoulders," or "because he had his nose pierced," or "because his fingernails were dirty," or "because he came to the interview wearing short pants and a T-shirt," the defendant would have articulated a "clear and reasonably specific" basis for its subjective opinion—the applicant's bad (in the employer's view) appearance. That subjective reason would therefore be a legally sufficient, legitimate, nondiscriminatory reason for not hiring the plaintiff applicant. The burden would then shift back to the plaintiff to offer sufficient evidence for a reasonable factfinder to find that the defendant's reason was pretext for discrimination.[25]

 Although we, sitting as an en banc court, have the ability to overrule our prior circuit precedent, *see Combs*, 106 F.3d at 1534, we do not believe our holding today is inconsistent with our past decisions. *See Allison v. Western Union Telegraph Co.*, 680 F.2d 1318, 1322 (11th Cir.1982) ("An employer's decision may properly be based on subjective factors." (citation omitted)); *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1011–14 (11th Cir.1984); *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1500 (11th Cir.1985) (A subjective reason "is legally sufficient to satisfy the employer's

---

25. The warnings in *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1255–56 (11th Cir.1999) (en banc) (Carnes, J., concurring), about the dangers of "perception prevarication" are not inconsistent with our holding in this case. Those warnings were directed at purely subjective, conclusory impressions of a litigant that are devoid of any objective facts which, if

false, can be contradicted by testimony or other evidence. As we explain in the text, where a decisionmaker's subjective reason is supported by a "clear and reasonably specific" explanation, as required by *Burdine*, there will be objective factors that can be tested against other testimony and evidence.

burden of produc[ing] [a legitimate, non-discriminatory reason] so long as it is capable of objective evaluation."); *Woody v. St. Clair County Comm'n,* 885 F.2d 1557, 1562–63 (11th Cir.1989) (affirming district court's judgment that employer's subjective evaluation of how long employee would stay on the job was not pretextual because it was based on objective indicators); *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1280 n. 17 (11th Cir.2000) ("[E]mployment decisions may legitimately be based on subjective criteria as long as the criteria are capable of objective evaluation and are stated with a sufficient degree of particularity."). But to the extent of any inconsistency between our past decisions and our decision today, of course, the rule we announce today controls.

We now apply this rule to the present case. Although the proffered reason, Chapman's poor interview, was subjective, AIGCS offered a clear and reasonably specific explanation of why Wogsland and Turnquist, the decisionmakers, arrived at that subjective conclusion. Wogsland stated:

> Within the interview that I conducted with [Chapman], it was basically that he was not very concise with the answers. He did not take an aggressive approach in asking me questions about the position, where we were going. His answers were not very sharp, to the point, when I asked them, which basically were the same comments that [Turnquist] gave me about his interview [with Chapman].

Wogsland observed that Chapman's imprecise answers were not "the answers [he] would expect [Chapman] needed to [be able to] give to technicians under his control, within his unit." As an example of an unclear answer given by Chapman, Wogsland stated that Chapman "wasn't very clear about why he had gone from Home [Insurance Company] to several other positions before he got to Transport...."

■ Turnquist explained that he too was concerned about how Chapman presented his work history. In comparing Wiggins and Chapman's interviews, Turnquist stated:

> I thought that Graham Wiggins made a better presentation of himself and his skills. His knowledge skills and abilities and thought that he would have—he seemed to exhibit. I just had—I don't have an answer to that—I seem—I felt I had more confidence in Graham in the way he presented his work history.

Even though Wogsland and Turnquist subjectively evaluated Chapman's interview, they also explained the grounds for their evaluation with reasonable clarity and specificity given the passage of time.[26] AIGCS thus met its burden of producing a legitimate, nondiscriminatory reason.

After AIGCS articulated this second reason, Chapman's poor interview, the burden shifted back to Chapman to present sufficient evidence that AIGCS's reason was pretextual. In response, Chapman said only that there was "limited

---

**26.** Chapman argues, among other things, that Wogsland and Turnquist's explanations are insufficient because they were neither contemporaneously documented nor detailed. First, we believe that their explanations, especially Wogsland's, were sufficiently detailed given the circumstances. Wogsland even provided an example of a question to which Chapman's answer was unclear. Second, the interview notes did not purport to be complete. Wogsland testified that he did not write down every word or even every topic of conversation. This Court has never held that an interviewer must take substantially verbatim notes of an interview, or even any notes at all, to be entitled to proffer legitimate, nondiscriminatory reasons gleaned from an interview, and we refuse to hold that today. Such close judicial oversight of a business and its hiring practices would be unprecedented and unwarranted.

Similarly, we have never held that an employer cannot rely upon reasons that are not written down in advance of the selection process, and we decline to do so now.

probative value of [Wogsland and Turnquist's] opinions about Mr. Chapman's appearance and demeanor" and that "this testimony is pretext for intentional discrimination." [27]

Our dissenting colleagues focus on Wogsland's statement that one reason he was unimpressed with Chapman was that he was not aggressive in answering questions during the interview. Because there is a stereotype that older people are not as aggressive as younger people, they would have us treat use of aggressiveness as a hiring criteria as equivalent to age bias, or at the least as highly suspicious. We decline to do so. In the rough and tumble, highly competitive business world, aggressiveness can be a valuable and much sought after trait. Just because a sought after trait is linked by stereotype to an impermissible consideration does not mean an employer cannot search for and consider the trait itself independently from the stereotype. For example, according to stereotype women are not as physically strong as men. If an employer is hiring people for positions that require a great deal of physical strength, it would be permissible for the decisionmakers to hire a man instead of a woman if that particular man has more physical strength than that particular woman, even though the decision could not be based on the stereotype about the comparative physical strength of men and women in general. In this case, the decisionmakers considered Chapman's lack of aggressiveness because he was not aggressive in the interview, not because of his age. Along these lines, it is noteworthy that Turnquist also thought another interviewee, who was only 39 years old, also was not aggressive enough for the position of Casualty Claims Manager.[28]

Chapman had a fair chance to respond to the objective bases for the subjective reason proffered for not hiring him, but Chapman never refuted those objective bases. He never said he asked a single question during the interview, never said he explained clearly during the interview why he had so many employers between Home Insurance Company and AI Transport, and never said he had given concise answers to the questions he was asked. Moreover, Chapman's affidavit submitted in response to AIGCS's summary judgment motion does not even mention the interview. Because the poor interview subjective reason backed up by clear and reasonably specific bases is a legitimate, nondiscriminatory reason, and Chapman failed to present sufficient evidence to show that the reason was pretextual, the defendants were entitled to summary judgment on the ADEA claims.[29] *See Combs,* 106 F.3d at 1543.

27. In deposition testimony, Chapman stated only that Wogsland and Turnquist were courteous, businesslike, professional and respectful during his interviews, something no one disputes. However, deposition testimony about that fact was not responsive to Wogsland and Turnquist's assessment of Chapman's performance in his interviews, and Chapman did not argue to the district court that it was responsive.

28. That other interviewee was Sevillian. Although not hired to be Casualty Claims Manager, Sevillian was hired for another position. That does not mean Wogsland or Turnquist disregarded Sevillian's lack of aggressiveness. It was only one factor in their assessment of the interviewees, and Sevillian definitely did not have the recent history of job instability that weighed against Chapman. Nor is there any basis in the record for assuming that aggressiveness was thought to be equally important in all positions across the board.

29. One of the issues we asked the parties to brief and argue was whether a plaintiff could establish pretext as to a proffered subjective reason by showing that a proffered objective reason was pretextual. Because we conclude that Chapman failed to create a genuine issue of material fact as to the objective reason, *see* Part IV.A.3.a *supra,* we have no occasion to address the objective-to-subjective pretext spillover issue. That part of the panel opinion, *see Chapman,* 180 F.3d at 1250, remains vacated. Of course, the fact that we do not address that issue does not in any way imply our agreement with the dissenting opinion about it.

### 4. Conclusion

In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual. *See id.* (requiring a plaintiff to rebut "all of the defendant's proffered nondiscriminatory reasons for its actions" to avoid judgment as a matter of law).[30] The defendants in this case proffered two nondiscriminatory reasons for failing to hire Chapman. He did not produce sufficient evidence to create a genuine issue of pretext as to either. Therefore, we affirm the district court's grant of summary judgment to the defendants on two independently adequate bases: Chapman's failure to create a genuine issue of pretext as to the objective reason, and also his failure to create a genuine issue of pretext as to the subjective reason.[31]

### B. *The Trial of Chapman's ADA Claims*

#### 1. Chapman's Motion for a New Trial

Part B of the panel opinion addresses Chapman's contentions that the jury verdict against him on his ADA claims should be overturned based upon the trial evidence. *See Chapman v. AI Transport,* 180 F.3d 1244, 1251 (11th Cir.1999). The panel concluded "that the district court did not abuse its discretion in refusing to grant Chapman's motion for a new trial on his ADA claims against all defendants." *Id.* Agreeing with that conclusion and the analysis supporting it, we reinstate Part B of the panel opinion.

#### 2. The Redaction of Part of the Position Statement

The panel opinion also deals with Chapman's contention that the district court

---

**30.** In *Combs,* the defendant employer proffered three legitimate, nondiscriminatory reasons why it had promoted another employee instead of the plaintiff. We "consider[ed] the evidence related to *each* of the three proffered nondiscriminatory reasons." *Id.* at 1539 (emphasis added). After analyzing each reason separately, we concluded that the plaintiff had presented sufficient evidence to show that two of the reasons were pretextual, but he had failed to present sufficient evidence to show the third reason was pretextual. *See id.* at 1539–43. Because the plaintiff failed to rebut one of the three reasons, we held that the defendant was entitled to judgment as a matter of law. *See id.* at 1543.

The dissenting opinion would carve out a number of exceptions to the well-established rule that a plaintiff must show pretext as to each proffered reason. To the extent this case presents a factual basis for any such exception, we reject that exception. To the extent this case does not present a factual basis for such an exception, we express no view on whether that exception might exist in some case with different facts.

**31.** While Chapman's main focus is on the failure to hire him for the Casualty Claims Manager position which went to Wiggins, he also contends that he has a viable ADEA claim as to the three other positions that went to Jones, Smith, and Sevillian. His written application note did express interest "concerning the openings or new positions to be available" at AIGCS, and said he "would wel-

come the opportunity to discuss this with you or to be considered for one of the open positions." Wogsland and Turnquist did consider Chapman for one of the open positions, the position of Casualty Claims Manager. After interviewing Chapman for that position, Wogsland and Turnquist were less than impressed with his interview and were concerned about his history of job instability. Given those facts, we do not think that a jury could reasonably infer age discrimination as to the other positions that went to Jones, Smith, and Sevillian. Moreover, as we have already mentioned, the position for which Jones was hired was not filled until Chapman had been terminated at AI Transport.

Implicit in Chapman's contentions about the other positions is the premise that an applicant can, by the simple expedient of expressing an interest in all open positions, put on an employer filling a large number of positions the burden of proffering reasons for not hiring the applicant for each position. That would be quite a burden. Here, for example, Wogsland alone hired people to fill 110 positions during the Fall of 1992 (Chapman was interviewed in October of 1992). At least where the employer considers an applicant for a particular position and has a reason for not hiring him that is generally applicable (as job instability is), the employer need not specifically consider that applicant for every other position that is open at the time or comes open in the future.

abused its discretion by excluding from evidence at trial part of the position statement the defendants had submitted to the EEOC in response to Chapman's charges. That statement was prepared by Esther Kornblau, an AIG employee, as part of the EEOC conciliation process. The part of the position statement that the district court refused to admit into evidence described Chapman's transfer by AI Transport to the position of SIR Manager as a promotion, when it was actually a lateral move. The panel concluded that part of the statement should have been admitted into evidence because it "would have been, from Chapman's perspective, evidence of the defendants' lack of credibility." *Chapman*, 180 F.3d at 1252. The panel posited that the "evidence might have been useful to impeach the defendants' general integrity." *Id.* at 1252 n. 2. However, the panel concluded that the district court's failure to admit that part of the position statement was harmless. *See id.* at 1252.

When we granted rehearing en banc we had intended to decide the issue of whether evidence of one corporate official's false statement concerning the plaintiff's employment is admissible to undermine the credibility of another corporate official, who was the actual decisionmaker, or to undermine the credibility of the corporation as a whole. Upon closer review of the record, however, we find that issue is not presented in this case. Although a corporate official who was uninvolved in Chapman's termination from AI Transport prepared the position statement, the AI Transport officials who were involved in his termination reviewed the statement and did not point out any mistakes. Thus, the false statement was directly relevant to those decision makers' credibility. We need not decide whether the district court abused its discretion in failing to admit the evidence, however, because we agree with the panel opinion that any error was harmless.

We leave vacated that part of the panel opinion indicating that a false or misleading statement by one corporate official may be used to undermine the credibility of another corporate official who was not involved in the making or submission of the statement. *See id.* at 1252. We also leave vacated any implication about general corporate credibility. *See id.* at 1252 n. 2. Those issues are not presented by this record, and we express no view on them.

### 3. The Award of Costs Pursuant to Rule 54(d)

The defendants, as the prevailing party, submitted a bill of costs pursuant to Federal Rule of Civil Procedure 54(d)(1), and the district court initially awarded costs to the defendants in the full amount requested, which was $34,504.90. However, after Chapman filed objections, the defendants submitted an amended bill of costs for $28,943.95. After deducting $7,088.70 from the amount requested in the amended bill of costs in order to remove items it found were not necessary to the litigation of the case, the district court awarded costs in the amount of $21,855.25. Chapman contends that in calculating the amount of costs he was required to pay, the district court erred by failing to take his financial status into account, as he requested in his opposition to the amended bill of costs.

We asked the parties to brief the issue of whether the district court has the authority to consider the non-prevailing party's financial resources, or the lack thereof, as a factor in calculating the amount of costs to be awarded. Rule 54(d)(1) provides that "costs other than attorney's fees shall be allowed as of course to the prevailing party unless the court otherwise directs." That provision establishes a presumption that costs are to be awarded to a prevailing party, but vests the district court with discretion to decide otherwise. *See* Fed.R.Civ.P. 54(d)(1); *Delta Air Lines, Inc. v. August*, 450 U.S. 346, 351, 101 S.Ct. 1146, 1149, 67 L.Ed.2d 287 (1981).

■■■■ However, the district court's discretion not to award the full amount of costs incurred by the prevailing party is not unfettered, *see Head v. Medford*, 62 F.3d 351, 354–55 (11th Cir.1995), "since denial of costs is in the nature of a penalty for some defection on [the prevailing party's] part in the. course of the litigation." *Walters v. Roadway Express, Inc.*, 557 F.2d 521, 526 (5th Cir.1977) (internal marks and citation omitted). To defeat the presumption and deny full costs, a district court must have and state a sound basis for doing so. *See Medford*, 62 F.3d at 354 (citing *Gilchrist v. Bolger*, 733 F.2d 1551, 1557 (11th Cir.1984)); *Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 446 (4th Cir.1999). We review a district court's decision about costs only for abuse of discretion. *See Technical Resource Servs.*, 134 F.3d at 1468.

■■■■ We hold that a non-prevailing party's financial status is a factor that a district court may, but need not, consider in its award of costs · pursuant to Rule 54(d). *See Smith v. Southeastern Penn. Transp. Auth.*, 47 F.3d 97, 100 (3rd Cir. 1995); *McGill v. Faulkner*, 18 F.3d 456, 459 (7th Cir.1994). If a district court in determining the amount of costs to award chooses to consider the non-prevailing party's financial status, it should require substantial documentation of a true inability to pay. *See McGill*, 18 F.3d at 459 (non-prevailing party offered no documentary support, relying instead on "unsupported, self-serving statements"); *Cherry*, 186 F.3d at 447 (no reduction in cost award despite proof that plaintiff had "no independent income and owned no property in her own name" because she had "sufficient access to marital property" and a 401(k) plan).

■■■■ Moreover, when awarding costs a district court should not consider the relative wealth of the parties. Comparing the financial resources of the parties .would unduly prejudice parties with assets and undermine "the presumption that Rule 54(d)(1) creates in prevailing parties' favor, and ... the foundation of the legal system that justice is administered to all equally, regardless of wealth or status." *Cherry*, 186 F.3d at 448; *see also Smith*, 47 F.3d at 100. Even in those rare circumstances where the non-prevailing party's financial circumstances are considered in determining the amount of costs to be awarded, a court may not decline to award any costs at all. *Cf. Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 917 (11th Cir.1982) ("we hold that in no case may the district court refuse altogether to award attorney's fees to a prevailing Title VII defendant because of the plaintiff's financial condition," because "[a] fee must be assessed which will serve the deterrent purpose of the statute, and no fee will provide no deterrence."). Subject to that restriction and to the requirement that there be clear proof of the non-prevailing party's dire financial circumstances before that factor can be considered, we leave it to the district court's discretion whether to do so in a particular case.

Chapman did submit financial disclosures to the district court, although the defendants contend those disclosures are not detailed enough and fail to establish that full costs should not be awarded. The district court noted that "the Eleventh Circuit has not yet directly addressed ability to pay as a factor in assessing costs." It then awarded the full amount of costs it found to have been necessary to the litigation.

We cannot tell from the district court order whether the court recognized that it had limited discretion to consider a non-prevailing party's financial condition in calculating the amount of costs to award, or thought it had no discretion regardless of the financial showing made.[32] According-

---

**32.** The final explanatory sentence of the district court's order awarding costs does say that "at least under the circumstances here, Chapman's financial situation is not a factor in whether the Court awards costs," but that statement was preceded in the same sen-

ly, we will vacate the order awarding costs and remand this case to the district court for the limited purpose of allowing the court to reconsider its decision in light of the rules we set out in this opinion. We do not mean to imply that the district court must consider Chapman's financial situation in calculating the amount of costs to be awarded, even if he proves his financial situation is extreme, but only that the court must realize that it has the discretion to do so.[33] Now that we have stated the law of the circuit on this matter, we will assume in cases arising hereafter that district courts are aware of their discretion and its parameters, unless there is some affirmative indication to the contrary.

## V. CONCLUSION

We AFFIRM the district court's grant of summary judgment to the defendants on the ADEA claims, and AFFIRM the judgment entered on the jury verdict in favor of the defendants on the ADA claims. We VACATE the order awarding costs to the defendants and REMAND the case to the district court for the limited purpose of allowing it to reconsider that order in light of our discussion about the matter in this opinion.

BIRCH, Circuit Judge, concurring in part and dissenting in part, in which BARKETT and WILSON, Circuit Judges, join:

While important to the parties involved and deserving of careful treatment by the court, this case does not appear to be unusual at first blush. An older employee with excellent performance evaluations applies to receive one of several higher-pay-

ing positions—but the positions all go to younger workers. The older employee sues his employer for age discrimination. This seemingly modest case, however, has become a vehicle for considering plaintiffs' right to a jury trial and the distinction between questions of fact for the jury and questions of law for the judge. Most specifically, this case focuses upon the dispositive weight to be accorded an employer's purely subjective rationale for a putative non-discriminatory adverse employment action. Because summary judgment is inappropriate in light of Defendants' purely subjective decisionmaking and in the face of significant gaps and inconsistencies in the record, I dissent.[1]

### I. Background

#### A. Procedural Posture

While the Americans with Disabilities Act portion of this case did proceed to trial, the district court granted summary judgment to Defendants as to the Age Discrimination in Employment Act ("ADEA") claim. In granting Defendants summary judgment on the ADEA claims, the district court rejected the magistrate judge's recommendation that summary judgment be denied as to AIGCS on the ADEA claim.

#### B. The Applicants & Application Process

The ADEA portion of this case arose from the interviewing and hiring process applied to certain applicants for positions with AIGCS.[2] The applicants included:

*Plaintiff John Chapman:* Chapman graduated with a bachelor's degree from Emory University in 1955 and with a J.D. from Stetson College of Law (an accredit-

---

tence with these words: "given the Eleventh Circuit's willingness to award statutorily permitted costs and fees limited only by the precaution that the party seeking reasonable reimbursement be the prevailing party."

**33.** Chapman makes other contentions relating to the district court's award of costs against him, but we find none of them merit discussion.

**1.** I concur in the majority opinion as to the appeal on the ADA trial verdict and on the award of costs.

**2.** To be consistent with the majority opinion, we will likewise refer throughout the opinion to the American International Adjustment Company as "AIGCS."

ed law school) in 1961.[3] His post-college experience included: State Farm (1957 to May 1964); Hartford Insurance (May 1964 to September 1969); Home Insurance (September 1969 to June 1985); the Claimsman (July 1985 to August 1986); J. Gordon Gaines/Liberty National Fire Insurance ("Gaines") (August 1986 to April 1988); B.R. Martin (April 1988 to September 1988); and AIGCS/AI Transport[4] (October 1988 to December 1992).[5] Thus, Chapman had a bachelor's degree, a J.D. from an accredited law school, and six employers in the 31 years between finishing college and starting to work for AIGCS. Chapman worked on Gaines files at all of the employers for which he worked between leaving Home Insurance and starting to work for AIGCS.[6]

*Warren Jones:* Jones graduated with a bachelor's degree from Jonathan C. Smith University in 1977. He attended insurance training classes but had no graduate or law school training.[7] His post-college experience included: Prudential (1977–79); Crawford & Company (from mid–1980 to mid 1982); Progressive (from mid–1982 to late 1982 or early 1983); USF & G (from late 1982/early 1983 to 1987 or 1988); AIGCS/AI Transport (1987 or 1988 to present).[8] Thus, Jones had a bachelor's degree, no graduate or law school training, and four employers in the 11 years between college and starting to work for the AIGCS.

*Duane Sevillian:* Sevillian graduated with a bachelor's degree from Johnson C. Smith College, and he received a J.D. from Atlanta Law School (an unaccredited law school) in 1980. After graduating from law school, Sevillian worked for: New York Life (from 1980 to 1981); Safeco (from 1981 to 1988); and AIGCS/AI Transport (from January 1989 to present).[9] Thus, Jones had a bachelor's degree, a J.D. from an unaccredited law school, and two employers in the eight years between law school and starting to work for AIGCS.

*John Smith:* Smith received an associate's degree from Middle Georgia College in 1962, a bachelor's degree from the University of Georgia in 1965, and a Masters in Science & Administration from Georgia College in 1976.[10] Smith's employment history included: Southeastern Underwriters (from June 1965 to February 1966) (as an inspection engineer); the United States Army (from February 1966 to February 1968); Crawford & Company (from March 1968 to March 1971); Georgia Farm Bureau Insurance Company (from March 1971 to March 1976); Prudential Insurance Company (from March 1976 to March 1977); Government Employees Insurance Company (from June 1977 to June 1979); Dairyland or Sentry Insurance Company (from June 1979 to June 1980); the Moore Group (from June 1980 to January 1986); Gulf Insurance Co. (from January 1986 to December 27, 1988); and AI Transport (December 27, 1988 to present).[11] Thus, Smith had associate's, bachelor's, and graduate degrees, no law school training, and seven employers in the twenty years

---

**3.** *See* Ptf's Ex. 48 to Spann Dep. II at D000065 (Chapman job application); *see also* R7–79–Ex. E–2 at ¶ 3. All depositions were filed as part of the summary judgment record. *See* R5–71; R6–76; R9–84; *see also En Banc* Brief of Defendants–Appellees at 1 n. 1.

**4.** A number of the applicants, including Chapman, had been initially hired by AIGCS and then were transferred to AI Transport as part of a restructuring.

**5.** *See* R7–79–Ex. E–3–4 at ¶¶ 3–7; Ptf's Ex. 30 to Zaleski Dep. (EEOC Position Stmt., Attach. 1) at 2; Ptf's Ex. 48 to Spann Dep. at D000065–D000068 (Chapman's job application and resume submitted to Defendants in 1988).

**6.** *See* R7–79–Ex. E–2–3 at ¶¶ 4–5.

**7.** *See* Jones Dep. at 21–26.

**8.** *See* Jones Dep. at 33–36.

**9.** *See* Sevillian Dep. at 11–17.

**10.** *See* Smith Dep. at 14–15.

**11.** *See* Smith Dep. at 17–31.

between his discharge from the army and beginning to work for AIGCS.

*Graham Wiggins:* Wiggins graduated from Tuskegee Institute with a bachelor's degree and attended Emory Law School for one year before leaving without graduating.[12] After leaving law school, Wiggins worked at Delta Airlines as a fueling agent, starting in Fall 1969, for 6 months. His insurance career included working at Allstate Insurance Co. (from February 1970 to 1974), Maryland Casualty Co. (from 1974 to 1978), and Gulf Insurance Co. (from 1978 to 1988), before beginning to work at AI Transport in 1988.[13] Thus, Wiggins had a bachelor's degree, one year of law school, and three employers in the 18 years of his insurance career before beginning to work for AIGCS.

In 1992, the applicants applied to transfer from AI Transport to sister company AIGCS. After applying, the applicants were each interviewed by both Jim Wogsland and Ward Turnquist for the position of casualty claims manager. After the interviews, Chapman was informed that he had not been hired for the casualty claims manager position, while the other four men were hired for a variety of positions: Jones for a complex director position (in March 1993); Sevillian for a fast track

manager position (in October 1992); Smith for a casualty claims specialist position (in October 1992); and Wiggins for the casualty claims manager position (in October 1992).[14]

## II. Analysis.

### A. Summary Judgment Standard of Review

Reviewing the briefs in this case and listening to the oral arguments, I was struck by the sense that defense counsel appeared to be arguing from a different procedural posture than the one actually at issue in this case. With a large number of material issues of fact, defense counsel often hypothesized—making assumptions or raising inferences from the evidence to fill gaps in the record.[15] Counsel's hypothesizing may have been appropriate and even persuasive in a case where he was arguing against summary judgment granted in Chapman's favor or was seeking to preserve a trial verdict in Defendants' favor, because the standard of review in those situations would require us to make all reasonable inferences in favor of Defendants.[16] However, because this case involves a grant of summary judgment awarded to *Defendants*, we are obliged to draw all reasonable inferences in favor of

---

**12.** *See* Wiggins Dep. at 15–16.

**13.** *See* Wiggins Dep. at 16–22, 26.

**14.** *See* Jones Dep. at 116–22; Sevillian Dep. at 51; Smith Dep. at 85–86; Wiggins Dep. at 67–70.

**15.** As I discuss in more detail, these hypotheses include: (1) defining the term "recent"; (2) justifying why Wogsland reviewed Smith's performance evaluations but not Chapman's; (3) assuming that Chapman must have been "mistaken" when he said that he thought that he interviewed with Wogsland before interview with Turnquist because Turnquist was just a "screening interview"; (4) claiming that Wogsland had viewed Sevilian's interview as being better than had Turnquist; and (5) claiming that either Wogsland or Turnquist considered Jones, Sevillian, or Smith's job history as stable or as better than Chapman's.

**16.** *See, e.g., Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988) ("A court evaluating a summary judgment motion must view the evidence in the light most favorable to the non-movant. If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. An appellate court applies this same legal standard when a party appeals an adverse summary judgment ruling.") (citations omitted); *Morro v. City of Birmingham,* 117 F.3d 508, 513 (11th Cir. 1997) ("In reviewing the sufficiency of the evidence to support the jury's verdict, we draw all reasonable inferences in favor of the non-movant, in order to determine 'whether or not reasonable jurors could have concluded as this jury did based on the evidence presented.' ") (citations omitted).

*Chapman. See, e.g., Taylor v. Runyon,* 175 F.3d 861, 866 (11th Cir.1999).[17]

*B. Standards for Assessing a Summary Judgment Motion in Employment Discrimination Case*

Like the majority, I assume that the burden-shifting test first announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to discrimination cases filed under the ADEA. *See Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir.1999); *see also Reeves v. Sanderson Plumbing Products, Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000). Applying that familiar test to this case, Chapman is required to establish as his *prima facie* case that he was a member of the class protected by the ADEA (i.e., was at least 40 years old at the time that he was denied promotion, *see* 29 U.S.C. § 631(a)), that he applied for one or more positions for which he was qualified, that he did not receive any of the positions for which he applied, and that substantially younger employees who were equally or less qualified than Chapman received the positions.[18] "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Once Chapman establishes his *prima facie* case, the burden then shifts to Defendants to produce at least one "legitimate, nondiscriminatory reason" for not selecting Chapman for each of the positions for which he applied. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If Defendants fail to produce a legitimate, nondiscriminatory reason for failing to hire Chapman, then "the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. If Defendants produce admissible evidence setting forth at least one

---

**17.** As a matter of description, the majority is correct in stating that courts in this circuit are not reluctant to grant summary judgment in employment discrimination cases. Indeed, because of the burden-shifting test applied in such cases, it would not be unreasonable to surmise that a significant majority of employment discrimination cases end with summary judgment granted to the defendants. That said, I emphasize a limit on the majority's statement as a *prescriptive* matter. It is true that, where an employer meets its burden of producing at least one justification that is both legitimate and nondiscriminatory and the employee fails to produce evidence tending to demonstrate pretext, then courts should not only be open to granting summary judgment, but, instead, *must* grant summary judgment as a matter of law. *See Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1333 (11th Cir.1998). However, where the employee produces evidence tending to demonstrate pretext, courts should proceed cautiously before granting summary judgment to the employer. Like the majority, *see* majority op. at 1025 n. 11, I recognize that the Supreme Court has rejected a *per se* rule stating that a showing of a *prima facie* case and of pretext is sufficient to survive a motion for judgment as a matter of law (and, inferentially, a motion for summary judgment), *see Reeves v. Sanderson Plumbing Products, Inc.,*

—— U.S. ——, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000), but the Supreme Court also admonished that, in many cases, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," *id.* Before granting summary judgment to an employer where the employee has offered evidence tending to establish pretext, courts must carefully balance a "number of factors," including at least the following: "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a law." *Id.* Like the Supreme Court, I see no need to discuss further the rules for when a *prima facie* case, plus pretext, is insufficient to survive a motion for judgment as a matter of law because this case does not present that situation.

**18.** *See Bogle v. Orange County Board of County Comm'rs,* 162 F.3d 653, 656–57 (11th Cir. 1998); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 (11th Cir.1997) (listing elements of *prima facie* case for discriminatory failure to promote claim).

legitimate, nondiscriminatory reason for their rejection of Chapman, the burden shifts back to Chapman to proffer evidence tending to show that the reasons offered by Defendants were pretextual, *i.e.*, "not the true reason[s] for the employment decision." *Id.* at 255–56, 101 S.Ct. at 1094–95. To this point, the majority and I agree on the substance of the law. However, I must clarify several issues.

### 1. The *Prima Facie* Case and the *Four Younger Applicants*

At no time at summary judgment or on appeal have Defendants challenged Chapman's *prima facie* case as to *any* of the four positions given to Jones, Sevillian, Smith, and Wiggins. Indeed, at summary judgment, *no* section of either Defendants' statements of undisputed material facts or their memoranda in support of summary judgment even addressed Chapman's *prima facie* case as to the applications for employment with AIGCS.[19] Instead, Defendants addressed only the second of the three *McDonnell Douglas* steps, *i.e.*, by offering justifications for hiring *Wiggins* instead of Chapman.[20] However, as to *Jones, Sevillian, and Smith*, Defendants only stated that Chapman "was not considered for the positions filled by Sevillian, Jones, and Smith"—but offered no justification for their decision not to consider him for those positions.[21] It is axiomatic that an argument not raised before the trial court or on appeal has been waived. *See Campaign for a Prosperous Georgia v. SEC*, 149 F.3d 1282, 1287 (11th Cir.1998) (holding that issue not raised on appeal is abandoned); *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir.1991) (holding that issue not raised before district court is waived). Accordingly, like the majority, I will consider the *prima facie* case as to each of the four employees to be undisputed and will analyze the justifications and pretext showings as to each of the four employees.

### 2. Subjectivity and the Legitimacy of Nondiscriminatory Reasons

At the outset, I must emphasize what my argument does and does not embrace. By suggesting the position that subjective reasons are *per se* illegitimate and then countering it, the majority erects a straw man and then topples it. That position, however, is neither one which I advocate nor one which I need to advocate in order to justify the conclusion that summary judgment was improvidently granted in this case. Admittedly, it would be difficult to justify a claim that subjective reasons are *always* inappropriate; my true position, instead, rests upon two venerable principles adopted in case after case by this circuit, as well as by many others.

First, courts have examined and should continue to examine subjective reasons with higher scrutiny than objective reasons. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir.1998) (rejecting subjective criteria that "are too subjective to allow for any meaningful comparison between" applicants and observing that such subjective criteria "cannot be relied upon by an employer seeking to defeat the plaintiff's prima facie case by showing that the plaintiff is less qualified than the applicant chosen for the promotion").[22] Notwithstanding the ma-

---

**19.** *See* R6–72, R6–73.

**20.** *See* R6–72 (Stmt. of Undisputed Facts) at 3, 5–6.

**21.** R6–72 (Stmt. of Undisputed Facts) at 2–4. As discussed below, this justification is not only insufficient but is actually evidence of discrimination. Additionally, a review of the passage of deposition cited by Defendants to support their claim that they did not even consider Chapman for positions other than the claims casualty manager position shows

that Wogsland, based on his knowledge of Chapman's resume and of the positions available at the time of the 1992 interviews, acknowledged that it was possible that Chapman was qualified for a number of positions open at that time, including, without limitation, the fast track claims manager position. *See* R5–70–Ex. I (Wogsland Dep.) at 186–90.

**22.** *See also Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir.1994) (Moreno, J.) (stating in case where the employer "seeks individuals with managerial, business and interpersonal

jority's disagreement with this principle, its wide acceptance rests upon sound logic. Subjective reasons, by their very nature, often serve to mask discrimination.[23] *See Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 798 (11th Cir.1988) ("[I]nformal, secretive and subjective hiring or promotion decision processes tend to facilitate the consideration of impermissible criteria."); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir.1985) ("This circuit has frequently noted ... that subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination. This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another.").[24] Thus, "[w]hile there is nothing inherently wrong with allowing decision makers to base decisions on subjective criteria," it is reasonable to scrutinize strictly decisions based on such subjective criteria, which " 'provide a ready mechanism' " for discrimination. *Carter*, 132 F.3d at 644 (quoting *Miles*, 750 F.2d at 871).

The second principle is that subjective reasons, like any other reason offered pursuant to the *McDonnell Douglas* test, must be legitimate, as well as nondiscriminatory. In this context, "legitimate" does not refer to the moral value of the nondiscriminatory reason, for "a defendant may ... [refuse to promote] an employee for a good or bad reason without violating federal law." *Damon*, 196 F.3d at 1361. Rather, "legitimate" refers to the requirements in *Burdine* that "[t]he explanation provided must be legally sufficient to justify a judgment for the defendant" and that the defendant must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." 450 U.S. at 255–56, 101 S.Ct. at 1094–95.[25] In judging whether a subjective reason is legitimate, we have required that it be "capable of objective evaluation." *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1500 (11th Cir. 1985). *See also Miles*, 750 F.2d at 871 ("[S]ubjective and vague criteria may be insufficient reasons given by an employer for its failure to [ ]hire because such criteria do not allow a reasonable opportunity for rebuttal.").[26] Thus, "the mere state-

---

skills and prefers people with prior experience in the petroleum industry" that "[w]e view these subjective and *ad hoc* criteria with greater scrutiny than we would if BP strictly followed written criteria."); *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1010–11 (11th Cir. 1984) ("[T]he nature of the defendant's selection process and of the reasons that he offers affects the weight of his burden. Where the reasons that the employer offers for rejection are based on purely subjective factors, the defendant's burden is greater.").

23. As I discuss below, this tendency is exacerbated where the subjective reason corresponds with discriminatory stereotypes.

24. *See also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C.Cir.1998) (*en banc*) ("Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination."); *McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1129 (8th Cir.1998); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1510 (10th Cir. 1997); *Lilly v. Harris–Teeter Supermarket*, 842 F.2d 1496, 1506 (4th Cir.1988); *Sweeney v.*

*Research Found. of SUNY*, 711 F.2d 1179, 1185 (2d Cir.1983).

25. As I discuss throughout the next section, defense counsel has offered many hypotheses not supported by admissible evidence. In addition to requiring that the nondiscriminatory reason be established "through the introduction of *admissible evidence*," *Burdine* also makes clear that "[a]n articulation not admitted into evidence will not suffice. Thus, *the defendant cannot meet its burden merely* though an answer to the complaint or *by argument of counsel*," 450 U.S. at 255 & n. 9, 101 S.Ct. at 1094 & n. 9 (emphasis ·added).

26. Interestingly, it was recently suggested that we should reject a sexual harassment plaintiff's subjective perception of her supervisor's conduct, partly because of:

the problem of perception prevarication. An employee who makes up or exaggerates a description of objective conduct runs a risk of being found out that is greater than the risk run by an employee who is attempting to make a case based upon her subjective impressions. There is more temptation to exaggerate, to "puff," to put subjective

ment that the [employer] selected the 'best qualified' would be insufficient to satisfy the *Burdine* requirements" because such a statement "leaves no opportunity for the employee to rebut the given reason as a pretext," while a claim that the person selected was better qualified by virtue of his or her "seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination of them" may be sufficient to satisfy the *Burdine* requirements. *Increase Minority Participation by Affirmative Change Today of Northwest Fla., Inc. v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990).[27]

In this case, my general concerns with subjective reasons are exacerbated by the

fact that Defendants' proffered reasons correspond strongly with the very stereotypes that the ADEA was designed to combat. A stereotype of older persons is that they are not "aggressive," such that employers frequently identify younger workers as "aggressive" and, thus, more desirable than older workers. *See, e.g., Damon*, 196 F.3d at 1362 ("Soto's remark to Kanafani's younger successor, D'Angelo, right after Kanafani was terminated, that Soto wanted 'aggressive, young men' like himself to be promoted is highly suggestive circumstantial evidence from which a jury could infer discriminatory animus. . . . The comment also arguably suggests that Soto had an ageist preference for young managers."; reversing grant of summary judgment in favor of employer).[28] It is

spin on the facts. A plaintiff describing her subjective impressions can say that while her supervisor's conduct might have appeared neutral to some, she felt, believed—just knew—it was lecherous.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1256 (11th Cir.1999) (*en banc*) (Carnes, J., conc.), *cert. denied*, —— U.S. ——, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000). This opinion also noted the difficulty that a supervisor would have "to rebut testimony about those perceptions." *Id.* I am incapable of finding any reasoned justification for rejecting wholesale the subjective perceptions of sexual harassment plaintiffs, while rendering unassailable the equally subjective perceptions of age discrimination defendants. At oral argument, defense counsel attempted to distinguish between the two situations by noting that the burden of persuasion remains with the plaintiff throughout all employment discrimination cases. As true as this statement is, it does not remedy my quandary, for the *burden of production*, as shifted to the defendants under *McDonnell Douglas*, still requires the defendants to proffer a legally sufficient reason. *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95. The reasoning offered in the *Mendoza* concurrence offers one explanation of why subjective perceptions should not be considered legally sufficient unless based on objective evidence.

27. *See also Knight v. Nassau County Civil Serv. Comm'n*, 649 F.2d 157, 161 (2d Cir. 1981) (concluding that reason offered was legally sufficient where it could be "objectively evaluated" and noting that "[t]he fact that satisfaction of job performance criteria is

judged by an employee's superiors does not necessarily warrant the inference that the evaluations are subjective").

28. *See also Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1553 (11th Cir.1988) (reversing judgment notwithstanding the verdict granted to employer where manager had made various statements indicating that he "believed that the older employees lacked an aggressive approach to business, that they were part of the 'cancer' and the 'malaise' that existed at the Sarasota plant, that the older employees were 'set in their ways,' that 'they were the reason that the business wasn't going forward,' and that 'they would have to be replaced with younger people' in order for the company's business to progress"); *Warter v. Bergen–Brunswig Corp.*, 162 F.3d 1171 (table) (9th Cir.1998) (finding that comments "that the company wanted to hire 'fresh, young blood,' and 'young, aggressive, recent college graduates' . . . are in themselves sufficient to support a jury verdict") (unpublished opinion cited solely for persuasive value); *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 53 (2d Cir.1998) (reversing grant of summary judgment to employer where supervisor requested chart of employees' ages, called older workers "old fogies" in Yiddish, and commented on the plaintiff's evaluation that plaintiff lacked "aggressive initiative to get new business"); *Boehms v. Crowell*, 139 F.3d 452, 457 (5th Cir.1998) (affirming district court's finding of age discrimination; rejecting defendant's claim "that Boehm's' nonselection [for promotion] was due to his negative 'approach to organizational change' and

interesting how often in the case law the words "young" and "aggressive" are linked together by defendant employers. The very frequency of this conjunction supports the conclusion that "aggressive" is a sign of "age bias, i.e., ... the assumption that older employees lack the aggressive and competitive disposition likely to be possessed by younger employees...." *Woroski v. Nashua Corp.*, 31 F.3d 105, 109 n. 2 (2d Cir.1994). Where courts have found that summary judgment for the employer is appropriate in the face of such comments, their conclusion was more likely to be *in spite of* the comments, rather than *because of* the comments. *See, e.g., id.* (noting that some of the other cited comments demonstrated neutral concerns). This is because of the purposes behind the ADEA:

> It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with

old age.... Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.

*Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) (citation omitted). Accordingly, rather than accepting wholesale the claim that Chapman did not appear "aggressive" as an adequate justification for rejecting his application for employment, we should, as with gender discrimination, be suspicious of employers' evaluations of a given employee's level of aggressiveness.[29] This is no less true in the area of age discrimination. *Cf. Aka,* 156 F.3d at 1298 ("[W]e cannot altogether ignore the fact that outward manifestations of 'enthusiasm' are just the kind of traits that advancing age and heart-related disability may tend to diminish.").

Applying these principles, I come, not to the conclusion that subjective reasons are

his lack of an 'aggressive and proactive leadership style' " and defendant's argument "that its business judgment in this regard should not be disturbed"); *Washington v. Honeywell, Inc.,* 94 F.3d 654 (table) (9th Cir.1996) (reversing grant of summary judgment to employer where "a manager allegedly told Washington that Honeywell 'liked to promote aggressive younger people' "; stating that the manager's alleged statement "went to the heart of the claim") (unpublished opinion cited solely for persuasive value); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 306 (3d Cir.1983) (reversing grant of summary judgment based on timeliness where employer made a belated explanation that the plaintiff was not hired because the employer "had needed someone 'aggressive,' someone 'vigorous,' someone with a background that could handle chemical problems at some of the mills.' ").

**29.** *See, e.g., Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 60–61 (1st Cir.1999) (" 'In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.' ... The concept of 'stereotyping' includes not only simple beliefs such as 'women are not aggressive' but also a host of more subtle cognitive phenomena which can skew perceptions and judgments.") (quoting *Price*

*Waterhouse v. Hopkins,* 490 U.S. 228, 249, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *superseded by statute on other grounds as stated in Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)); *Pivirotto v. Innovative Sys.,* 191 F.3d 344, 355 (3d Cir.1999) (citing *Price Waterhouse* for proposition that "an employer may act on gender-based stereotypes, firing women it perceives as not feminine enough (or as too feminine), or discharging women who are too aggressive while not doing the same to male employees"); *Hopkins v. Price Waterhouse,* 920 F.2d 967, 973 n. 3 (D.C.Cir.1990) (quoting with approval Radford, *Sex Stereotyping and the Promotion of Women to Positions of Power,* 41 Hastings L.J. 471, 533 (1990): "Obviously, in cases such as *Hopkins,* in which the legitimate reason articulated by the employer was of such a subjective nature as to itself invite stereotyping, the employer bears the additional burden of showing that the stereotyped attitudes did not so pervade the subjective evaluation as to destroy the articulated reason's legitimacy. In cases in which such subjective factors as 'interpersonal skills' are offered as the determining cause for the negative employment decision, Justice Brennan's mandate in *Hopkins* [490 U.S. at 252, 109 S.Ct. at 1791] that 'the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive' should be adopted.' ").

*per se* illegitimate, but to the conclusion that subjective reasons, like other reasons offered pursuant to *Burdine,* must be given weight according to their legal sufficiency. Some subjective reasons, those which cannot be objectively evaluated and/or are vague, should be accorded no weight. Other subjective reasons, such as those that are premised on stereotypes, should be scrutinized strictly.[30] Subjective reasons, like objective reasons, should be evaluated based on the evidence offered in their support and the context in which those reasons arose. For example, courts have been more willing to accept subjective reasons where specific criteria existed prior to the adverse employment action. *See, e.g., Carter,* 132 F.3d at 643 (reversing summary judgment in part because of poorly drafted criteria); *Miles,* 750 F.2d at 871–72 (noting that lack of preexisting criteria tends to weaken the value of a subjective evaluation). Similarly, courts have been more willing to accept subjective reasons where evidence preexisting the litigation supports those reasons. *See, e.g., Aka,* 156 F.3d at 1298 (noting that lack of note on interview summary regarding plaintiff's alleged lack of enthusiasm weakened subjective evaluation). Thus, a subjective reason that is clear and specific, is capable of objective evaluation, is not premised on a stereotype, is consistent with clear criteria that preexisted the adverse employment action, and was documented at the time of the adverse employment action and before litigation is initiated should be accorded more weight than a subjective reason that does not meet all of those factors.

*3. Distinguishing Between the Business Judgment Rule and Challenges to the Credibility of Proffered Non-discriminatory Reasons*

The majority, like Defendants, contends that a number of the arguments raised by Chapman, *e.g.,* regarding the job instability of other candidates over their entire careers, contravene a long line of cases that protect an employer's business judgment from being second-guessed by judges or by juries.[31] This argument miscomprehends Chapman's claims, as well as the points made in this dissent. While the business judgment rule protects the sincere employer against second-guessing of the reasonableness of its judgments, it does not protect the employer against attacks on its credibility. *See Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) ("The inquiry of the ADEA is limited to whether [the defendant's decision makers] *believed* that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge. . . ."). A showing that Wogsland and Turnquist acted inconsistently would tend to establish that they lack credibility. *Cf. Williams v. City of Valdosta,* 689 F.2d 964, 975 (11th Cir.1982) (re-

---

**30.** While the majority expresses concern that the approach outlined by me and adopted by other courts would stymie employers' attempts to hire people with desirable, but potentially stereotypical, traits, this approach, in reality, would not have that result. I do not deny that some characteristics, such as physical strength, may simultaneously be both "valuable and much sought after" traits *and* consistent with stereotypes, nor do I seek to preclude employers from attempting to hire employees with such traits. Majority Op. at 1036. Where, however, such traits are used as criteria, it is especially important that an employer's subjective perception of an applicant with regard to such traits be supported by objective evidence. For instance, with the majority's example of physical strength, sheer reliance on gender stereotypes would be insufficient, but the employer would be able to rely on perceptions grounded on objective evidence, such as weight-lifting tests.

**31.** *See, e.g., Damon,* 196 F.3d at 1361("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); *Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497, 1501 (11th Cir. 1991) ("[W]e do 'not sit as a super-personnel department that reexamines an entity's business decisions.'") (quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir. 1986)).

versing grant of new trial to employer in First Amendment demotion case despite employer's legitimate justification that employee had not passed a promotional exam where the employer's "adherence to its formal promotional policy was inconsistent and arbitrary at best" because "[t]his inconsistency supports the conclusion that resort to the examination requirement was a pretext for singling out [the plaintiff] for unfavorable treatment."). Accordingly, while the business judgment rule protects Defendants against claims that their reasons are *imprudent,* it must not be used to shield Defendants against colorable claims that their reasons are *non-credible.*

### 4. Pretext Where the Defendant Offers Multiple Reasons for its Actions

We noted in *Combs* that "[p]rovided that the record evidence would permit a reasonable factfinder to reject *each* of [the employer's] proffered explanations for its decision, the case properly was submitted to the jury for a decision on the ultimate question of intentional discrimination." 106 F.3d at 1539 (emphasis added). As a general rule, I agree with the concept that, where an employer offers multiple legitimate, nondiscriminatory reasons for its challenged action, the employee must proffer evidence that shows pretext as to *each* of the proffered reasons. However, I also agree with other circuits that there are limits to this general rule. The Third Circuit, addressing this question, stated:

> We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no

evidence undermining those remaining rationales in particular is available.

*Fuentes v. Perskie,* 32 F.3d 759, 764–65 n. 7 (3d Cir.1994); *see also Narin v. Lower Merion Sch. Dist.,* 206 F.3d 323, 332–34 (3d Cir.2000) (discussing *Fuentes* ). Similarly, the Seventh Circuit has observed that

> under the established law of this circuit, the existence of a genuine issue of triable fact with respect to some of the reasons for discharge proffered by the employer is of no consequence as long as at least one reason is uncontested.... [H]owever, we have indicated that this analysis ought not to be followed when the grounds that are offered are so intertwined or the pretextual ground for one of them so strong that a reasonable jury, hearing all the proffered grounds, could find for the plaintiff on the discrimination issue.

*Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 399 (7th Cir.1998) (citing *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 920 (7th Cir.1996) and *Russell v. Acme–Evans Co.,* 51 F.3d 64, 69–70 (7th Cir.1995)). The Sixth Circuit, citing the Seventh Circuit's *Russell* decision, has observed "that an employer's strategy of simply tossing out a number of reasons to support its employment action in the hope that one of them will 'stick' could easily backfire" such that "a multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the 'honest belief' rule is inappropriate." *Smith v. Chrysler Corp.,* 155 F.3d 799, 809 (6th Cir.1998).

I find persuasive these cases and the reasoning applied in them. While the general rule requiring an employment discrimination plaintiff to demonstrate pretext as to each and every legitimate, nondiscriminatory reason offered by the employer is reasonable in the majority of cases, that general rule fails when applied

to a small percentage of cases.[32] Demonstrating pretext by "[c]asting doubt on an employer's asserted reasons for an adverse employment action" is an indirect means of demonstrating "that the employer acted with the forbidden animus." *Taylor,* 175 F.3d at 867; *see also Wolf,* 77 F.3d at 919 ("Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action'") (quoting *Russell,* 51 F.3d at 68); *Black's Law Dictionary* 1206 (7th ed.1999) (defining "pretext" as "[a] false or weak reason or motive advanced to hide the actual or strong reason or motive"). The reason why we have the general rule requiring an employment discrimination plaintiff to dispute each proffered reason is that, where at least one independent justification for the challenged employment action remains unscathed after the plaintiff attempts to establish pretext, a jury could not presume by the failure of another independent justification that the real motivation was discriminatory animus. *See Russell,* 51 F.3d at 69. This accords well with common sense, for, if the inference of discriminatory animus arises from the failure of all legitimate reasons offered by the defendant, then the inference is inappropriate where one or more legitimate reasons remain unrebutted. However, common sense also counsels that there are some situations where the failure of one proffered reason may affect the reliability of other proffered reasons. Like the Seventh Circuit, I believe that logic tells us that, where two legitimate reasons proffered by an employer are intertwined, the employee's showing of pretext as to one of those reasons may (but not always will)[33] sufficiently weaken the other reason so as to preclude a grant of summary judgment to the employer. *See Russell,* 51 F.3d at 70. Similarly, it is reasonable, where the showing of pretext as to one reason is sufficiently strong as to permit a jury to find that the employer (or its decisionmaker) lacks all credibility, to conclude that summary judgment is inappropriate—even without a specific showing of pretext as to another reason. *See id.* I likewise find persuasive the reasoning of the Third and Sixth Circuits where they find that the proffering of a large number of arguably pretextual reasons may cast sufficient doubt on the remainder of the proffered reasons, such that summary judgment should be denied. *See Smith,* 155 F.3d at 809; *Fuentes,* 32 F.3d at 764 n. 7. This is but common sense: if a person is shown to be a liar in an outrageous manner or is shown to have lied about a number of issues, the inference that the person is *non-credible,* and should not be believed as to other issues, is a reasonable one.

The D.C. Circuit, sitting *en banc,* has suggested a fourth exception to the general rule: where an employer offers an objective reason for its employment action (*e.g.,* that the plaintiff was less qualified than the person hired instead of the plaintiff) and a subjective reason (*e.g.,* that the plaintiff failed to show "enthusiasm" or "interest"), the fact that the plaintiff has offered evidence establishing pretext as to the objective reason creates a question for

**32.** Indeed, as the various cases discussing this exception to the general rule illustrate, the percentage of cases affected by the exception is quite small. *See Narin,* 206 F.3d at 332–34 (holding that exception did not apply under the facts presented in that case); *Smith,* 155 F.3d at 809 (same); *Adreani,* 154 F.3d at 399 (same); *Wolf,* 77 F.3d at 923 (same); *Russell,* 51 F.3d at 70 (same). *But see Aka,* 156 F.3d at 1298 (holding that, where "a jury could find that Aka was in all other respects markedly better qualified for the job" for which he had applied, that the interviewer's claims that

she subjectively viewed the applicant's interview as poor should be submitted to the jury for a credibility assessment).

**33.** This would require a factual analysis as to how intertwined the reasons were. *See, e.g., Adreani,* 154 F.3d at 399 (analyzing whether the reasons were sufficiently intertwined to permit application of the "so intertwined" exception to the rule that the plaintiff must show pretext as to each separate reason).

the jury as to the disputed [34] subjective assessments. *See Aka,* 156 F.3d at 1298–99. This, like the other exceptions suggested by the Third, Sixth, and Seventh Circuits, accords well with common sense. When a reason is subjective, its validity depends entirely on the credibility of the witness offering the reason. Where that credibility has been compromised, a jury could reasonably conclude that the subjective reason offered by the witness is not credible or, in other words, that the subjective reason "was untrue—indeed, a lie." *Id.*

Additionally, I am concerned that if we follow the suggestion of Defendants and refuse to adopt these reasonable exceptions, we will have created a blueprint for evasion. This hoary term is perhaps overused, but it is in this case an appropriate one. If a defendant can offer with impunity a slew of nondiscriminatory reasons in a summary judgment motion, with the knowledge that a strong showing of pretextuality as to 99% of them would be irrelevant as long as but one survives unscathed, then employment discrimination cases will be, for all practical purposes, precluded. This problem is exacerbated where the one reason that survives the onslaught is a purely subjective one. If we do not apply the reasonable exceptions adopted by the other circuits, employers will be encouraged to throw their reasons like mud at a wall—with the certainty that one of those reasons will stick because of the unlikelihood of the plaintiff being able to prove that the purely subjective perception of the decisionmaker was dishonest without referring to the proof that other reasons offered were pretextual.

For all of the above reasons, I would adopt the Third, Sixth, Seventh, and D.C. Circuits' exceptions to the general rule of requiring a plaintiff to rebut each proffered reason. In addition to their internal logic, these exceptions are consistent with the Supreme Court's admonition that the *McDonnell Douglas* test "was 'never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

### 5. Multiple Ways of Disputing Nondiscriminatory Reasons

Just as "there is more than one way to skin a cat," there is also more than one

---

**34.** It is true that Aka, unlike Chapman, specifically disputed the subjective assessment of his interviewer. *See Aka,* 156 F.3d at 1298 ("Aka claims that he, too, expressed enthusiasm at his interview...."). I believe that this is a distinction without a difference. If the only evidence in support of Chapman's claim was that he had said that his interviews went well, that he was aggressive during his interviews, and that he offered sharp and concise answers, it seems unlikely that a majority of judges on this court would conclude that he had raised a genuine dispute regarding a material fact. Indeed, subjective perceptions of an employee, without more, are insufficient to survive summary judgment. *See, e.g., Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir. 1997) (adopting reasoning of district court summary judgment order); *Hawkins v. Pepsi-Co, Inc.,* 203 F.3d 274, 280 (4th Cir.2000); *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994); *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980) (stating that the employee's "perception of himself ... is not relevant. It is the perception of the decision maker which is relevant"). Indeed, in *Aka,* the dissent challenged Aka's disputation of the subjective assessment on the ground that he had "offered no evidence that he was more enthusiastic than [the successful applicant] Valenzuela at the interview." 156 F.3d at 1298 n. 19. Even more to the point, Defendants raised this same ground at summary judgment by stating that "Plaintiff's good opinion of his qualifications is not sufficient to defeat summary judgment." R9–90–Ex. A at 11. Because the only real means to challenging Wogsland and Turnquist's subjective assessments of the interview is to challenge their credibility, I conclude that it would not only be insufficient for Chapman to counter their claims with his own subjective assessments, but that it is also futile and, thus, unnecessary for him to do so.

way for a plaintiff to challenge a defendant's proffered nondiscriminatory reasons. *See Reeves*, 120 S.Ct. at 2108 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). As the Supreme Court stated in *Burdine*, once a defendant proffers legitimate, nondiscriminatory reasons, a plaintiff may dispute those reasons by showing "that she has been the victim of intentional discrimination ... either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U.S. at 256, 101 S.Ct. at 1095. I mention this principle not because I believe that the majority disputes it, but because Chapman's attack on Defendants' proffered reasons involves not only challenges to the credibility of the

reasons offered, but also a showing of disparate treatment that is relevant to the ultimate question of whether a discriminatory reason more likely motivated Defendants in their decision not to hire Chapman than did the proffered reasons.

### 6. Conclusion

In conclusion, the majority and I approach this case from a similar, yet not identical, perspective. Applying these principles to the summary judgment record, I find a large number of disputed facts and factual claims not supported by the record. Accordingly, I turn to a close review of the summary judgment record.

### C. Gaps and Inconsistencies in the Record

#### 1. "Recent"

Turning first to the claim that Chapman was rejected because of his "recent" [35] his-

---

**35.** The majority asserts that the actual "job history" reason for Defendants' decision not to hire Chapman was his lack of job stability during a "specified" time period—not the recency of that period. *See, especially*, Majority Op. at 1033, n. 24. This conclusion fails for a number of reasons. First, Wogsland stated in his deposition that one of the reasons supporting his decision not to hire Chapman was "the lack of *recent* stability in job positions prior to joining AI Transport." R7–79–Ex. H (Wogsland Dep.) at 134 (emphasis added). This statement, which the majority attempts to gloss over, *see* Majority Op. at 1033, n. 24, is not only part of the summary judgment record, but it is a statement primarily relied upon by Defendants on appeal. *See* Brief of Defendants/Appellees at 31–32 n. 11; *En Banc* Brief of Defendants–Appellees at 2, 4. Second, the quote upon which the majority relies for its conclusion regarding Defendants' "job history" reason merely states that Wogsland and Turnquist had "questions" about Chapman's job history during that time period. *See* R8–81–Ex. B (Wogsland Dep.) at 111 (quoted in Majority Op. at 1033, n. 24). In that quote, unlike in his statement regarding Chapman's "recent" job history, Wogsland does not say that these questions were a basis for his job decision. Of course, I do not dispute that this statement *explains* Wogsland's subsequent statement that he relied on Chapman's lack of "recent" job stability in making his decision not to hire Chapman.

Rather, I recognize that the mere fact that an employer had "questions" about an applicant does not mean that the employer rejected the applicant because of those questions. Additionally, while the majority may not believe that Defendants' "job history" explanation relies upon Wogsland's characterization of Chapman's alleged job instability as "recent," Defendants on appeal not only did not make the argument on which the majority focuses, but, instead, they repeatedly emphasized the "recent" aspect of their "job history" reason. *See, e.g.*, Brief of Defendants/Appellees at 31 n. 11 ("*recent* history of job skipping") (emphasis in original); *id.* at 32 (asserting that Chapman "had two strikes against him: he interviewed poorly *and* had a recent history of job skipping") (emphasis in original); *En Banc* Brief of Defendants–Appellees at 2 (stating that, in addition to Wogsland's perception of Chapman's interview, "Wogsland also was concerned about plaintiff's *recent* work history, which suggested a tendency to change jobs fairly often") (emphasis in original); *id.* at 3 ("More recently, though, plaintiff began job skipping"); *id.* at 4 ("'*recent* stability in job positions'") (quoting Wogsland Dep. at 134 and adding emphasis); *id.* at 25 (discussing Wogsland's decision to "look[ ] at *recent* histories") (bracketing added) (emphasis in original); *id.* (asserting that Chapman "had more *recent* job changes than any comparative") (emphasis in original); Appellee's Supplemental Letter–Brief of July 21, 2000 at 2

tory of job skipping, I note that "recent" is not a clear term with a definite timeframe attached. In arguing that we should defer to the definition used by Wogsland in evaluating Chapman, Defendants allude to a 10–year timeframe before the 1992 interviews—but, of necessity, their allusions are without record citations because record citations to a definition do not exist.[36] An exhaustive search of the record shows that neither Wogsland nor Turnquist *ever* defined "recent." Thus, when asked at oral argument if the record included a definition of "recent," defense counsel could only argue that "recent" implicitly was "the period when plaintiff switched jobs." Not only is this definition without record citation and hypothetical,[37] but the fact remains that defense counsel has now offered two different definitions of "recent": ten[38] years before the 1992 interviews and a fuzzy period including the time between Chapman's employment with Home and

his employment by AIGCS. There is no reason that we should privilege these periods of time over another reasonable definition of "recent"—for they are not definitions provided by the record.

Even worse than the fact that defense counsel has offered us two different, unsupported definitions of "recent" is the fact that Wogsland himself used two different definitions of "recent" in evaluating Chapman. Wogsland stated that he was concerned about "the lack of *recent* stability in job positions prior to joining AI Transport."[39] This "recent" time period apparently includes Chapman's employment with Gaines and The Claimsman on Gaines work. Wogsland also stated that he was "not happy with" the fact that Chapman "had not had any *recent* general liability experience."[40] It is undisputed that Chapman gained general liability experience while working with Gaines and

("*recent* work history") (emphasis in original); *id.* at 3 (stating that Defendants' judgment was "that recent job stability is important"); *id.* (explaining focus "on more recent events"). Beyond the fact that our precedent holds that an issue not raised on appeal is deemed to be abandoned, *see Campaign for a Prosperous Georgia*, 149 F.3d at 1287, I suspect that Defendants' consistent emphasis on the characterization of Chapman's alleged job instability as "recent" is purposeful. The *only* distinction between Chapman and the three comparators of Jones, Sevillian, and Smith that Defendants have offered on appeal (though not at summary judgment) is that Chapman's period of alleged job instability was more "recent" than were the Jones, Sevillian, and Smith's periods of job instability. In light of their inability to use anything other than timeframe to justify their decision to hire Jones, Sevillian, and Smith instead of Chapman, Defendants were faced with a decision: either rely on the vague, undefined, and inconsistent term "recent" or have *no argument* whatsoever to defend that decision. Indeed, the majority likewise sought to explain away Jones, Sevillian, and Smith's hiring by relying almost exclusively on that "recent" timeframe. *See* Majority Op. at 1028–34 (relying on timeframe argument and on fact that Jones was hired after Chapman was fired by AI Transport for insubordination). Because, as I discuss in further detail, there is neither evidence in the record indicating either that

Wogsland or Turnquist knew of the insubordination or that they relied on that for their decision to hire Jones instead of Chapman nor argument either at summary judgment or on appeal that we should consider that justification, rejection of the "recent" characterization would nullify Defendants' only justification on appeal.

**36.** *See En Banc* Brief of Defendants–Appellants at 25.

**37.** Since one possible theory of pretext in this case is that Wogsland purposely tailored his timeframe of concern in order to justify rejecting Chapman, I suspect that defense counsel regrets suggesting this particular hypothetical definition.

**38.** Indeed, at oral argument, defense counsel suggested a *third* definition of "recent"—namely, 12–13 years before the 1992 interviews. *See also En Banc* Brief of Defendants–Appellees at 6–8. Defendants' *en banc* brief also proffers a *fourth* definition of "recent"—namely, 7 years before the 1992 interviews. *See id.* at 25.

**39.** R7–79–Ex. H (Wogsland Dep.) at 134 (emphasis added).

**40.** R7–79–Ex. H (Wogsland Dep.) at 107 (emphasis added).

The Claimsman on Gaines work.[41] Accordingly, "recent" in the context of general liability experience did not include Chapman's employment with Gaines and The Claimsman. This is troubling, not only in light of the lack of a definition of "recent" in the record, but also because the differing timeframes were selectively applied so as to maximize the harm to Chapman's job application. Indeed, this selective application appears on its face to be "transparently pretextual, and ... to have been tailored to the needs of the occasion." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1398 (6th Cir.1990).

It may be that defense counsel could persuade a reasonable jury that there is a very good reason for the differing timeframes, or that Wogsland could testify at trial as to a reasonable definition of "recent" that would account for his varying treatment of different aspects of Chapman's job history. But even if we cannot discount those possibilities or may find persuasive the hypothetical definitions offered by defense counsel,[42] the procedural posture compels us to conclude that summary judgment was improvidently granted.

### *2. "Job-skipping"*

It is undisputed that the other applicants each had less experience than did Chapman. It is also undisputed that the other applicants each had experienced a number of job changes in their comparatively shorter careers, with Jones having four employers in the eleven years between ending school and starting with AI Transport, Sevillian having two employers in the eight-plus years between ending school and starting with AI Transport, Smith having seven employers in the twenty years between leaving the Army and starting with AI Transport, and Wiggins having three employers in the eighteen years between beginning his career in insurance and starting with AI Transport.[43, 44] Thus, while Chapman had six em-

**41.** *See* R7–79, Ex. E at 2, ¶ 4; Ptf's Ex. 48 to Spann Dep II at D001071 (Turnquist's interview notes which note "GL" for "general liability"); Ptf's Ex. 48 to Spann Dep. at D001072 (Wogsland's interview notes which note "GL" for "general liability").

**42.** Of all of the hypotheses offered for the definition of "recent," I find least credible the suggestions that measure back ten (or twelve or thirteen) years from the 1992 interviews. Yet Wogsland's testimony at his deposition is clear about only one thing: that his definition of "recent" focused on the time period *"prior to* [Chapman] joining AI Transport." R7–79– Ex. H (Wogsland Dep.) at 134 (emphasis added). Thus, if we (following Defendants' suggestion) measure back ten (or twelve or thirteen) years, we should measure back from 1988, when AIGCS initially hired Chapman. As I discuss further, *that* is a period of job instability for other job applicants hired by AIGCS—particularly, Smith.

**43.** *See* Jones Dep. at 33–36; Sevillian Dep. at 11–17; Smith Dep. at 17–31; Wiggins Dep. at 16–22, 26. In Smith's working career, he held nine jobs in the twenty-three years between graduating from college and starting with AI Transport. *See* Smith Dep. at 17–31. In light of the fact that the second job was

with the Army during the mid- to late-sixties, I will measure the relevant time period from his discharge from the Army.

**44.** The majority notes that Chapman did not argue at summary judgment that applicants other than Wiggins had similar or worse histories of job stability. However, a review of the summary judgment record reveals that *Defendants* never raised at summary judgment the claim that applicants other than Wiggins had demonstrated job stability. Indeed, in referring to Wiggins' job history, Chapman was responding to the claim that he was not hired *for the casualty claims manager position* because of his lack of recent job stability. *See* R6–72 (Stmt. of Undisputed Facts) at 3–4, ¶¶ 13, 17–18; R7–79 (Resp. to Stmt. of Undisputed Facts) at 3–4, ¶¶ 13, 17–18. By contrast, the only justification given for not hiring Chapman for any of the positions given to Jones, Sevillian, and Smith is the singularly unilluminating statement that he was not considered for their positions. *See* R6–72 (Stmt. of Undisputed Facts) at 4, ¶ 21. It is true that in attempting to dispute Chapman's claim that he was more qualified than Jones, Sevillian, and Smith, Defendants did cite to the portions of Wogsland and Turnquist's depositions where they justify not hiring Chapman *for the casualty claims manager*

ployers over a thirty-one year career prior to starting to work for AI Transport,[45] his average of 5.16 years per employer compares favorably with each of the other four men: Jones (average of 2.75 years per employer), Sevillian (average of 4+ years per employer), Smith (average of. 2.86 years per employer), and Wiggins (average of 6 years per employer)—with only Wiggins having a better average of years per employer. And yet, *Chapman* was the only one noted as having job stability problems—and the only one not hired by AIGCS.

The majority (agreeing with the Defendants) argues that relying on these averages usurps the Defendants' business judgment in contravention of a long line of cases. *See, e.g., Damon,* 196 F.3d at 1361; *Alphin,* 940 F.2d at 1501. As I previously discussed, this argument misapplies the business judgment rule by protecting Defendants against attacks on their credibility. *See Elrod,* 939 F.2d at 1470. Where an employer asserts that it was concerned about the job stability of an applicant, the fact that other applicants have a history of job instability but were not penalized for that history tends to demonstrate a lack of credibility. *Cf. Alphin,* 940 F.2d at 1501–02 (discussing business judgment rule and reversing grant of summary judgment to employer where employee proffered evidence tending to show that he was competent in his work and that similarly situated employees had received more favorable treatment). Thus, while merely showing that the employer was mistaken is not sufficient to show pretext, "both the Su-

preme Court and this court have observed that evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting [the] plaintiff was pretextual." *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1340 (11th Cir.2000). I do not dispute that, if a jury finds that Wogsland was sincere in his belief that Chapman's "recent" job history was unstable, then the business judgment rule protects him from the jury second-guessing his asserted conclusion that that job instability merited not hiring Chapman. I merely conclude that, because a reasonable jury could find that Wogsland's treatment of the various applicants' job histories was inconsistent and, therefore, that Defendants' job history justification was pretextual, it is inappropriate for us to take this case out of the hands of the jury. *Cf. Williams,* 689 F.2d at 975 (reversing grant of new trial to employer where the employer's "adherence to its formal promotional policy was inconsistent and arbitrary at best" because "[t]his inconsistency supports the conclusion that resort to the examination requirement was a pretext for singling out [the plaintiff] for unfavorable treatment.").

Additionally, there is no evidence, *anywhere,* to indicate that Wogsland or Turnquist judged Chapman's job instability to be worse than either Jones's or Smith's. Indeed, the only evidence of any comparison made between any of the candidates was Turnquist's statement that he "felt [he] had more confidence in Graham [Wiggins] in the way he presented his work history."[46] Thus, Defendants' attempt to

---

*position,* but they never cite any evidence comparing Chapman to Jones, Sevillian, and Smith—or even any evidence referencing Jones, Sevillian, and Smith's experience or job history. *See* R8–82 (Stmt. of Undisputed Facts) at 17–18, ¶ 26. Accordingly, if we should not consider Chapman's arguments on appeal about the lack of job stability demonstrated by Jones, Sevillian, and Smith, we should also not consider the arguments to which Chapman is responding: namely, any claims by Defendants that Jones, Sevillian, and Smith are in any way equal to or superior to Chapman. Rather, Defendants should be

limited to their decision (unexplained at summary judgment) not to consider Chapman for the positions given to Jones, Sevillian, and Smith. As discussed below, this discriminatory treatment, for which Defendants did not offer any legitimate, nondiscriminatory justification at summary judgment, itself justifies reversing summary judgment and remanding for trial.

**45.** *See* R7–79, Ex. E at 2–4.

**46.** Turnquist Dep. at 79. This quote, in fact, does not even state that Wiggins' job history

protect the "business judgment" of Wogsland and of Turnquist assumes that a business judgment has been made, *i.e.*, that Wogsland and Turnquist actually viewed Chapman's job history to be *worse than* his fellow applicants. It also assumes that Wogsland and Turnquist believed that óverall career history was irrelevant or, at least, less important than recent job history. Yet there is no evidence to indicate that they agree with that position or applied it in evaluating the applicants. To the contrary, Turnquist testified that he looked to the "entire work history" of a candidate [47] and that his concerns were "not necessarily" focused on the timeframe between Chapman's employment by Home Insurance and his employment by AI Transport but, instead, that he looked at Chapman's entire career.[48] Those statements notwithstanding, Turnquist could

not recall having any concerns about the stability of *Smith*'s prior employment history, despite the fact that he had worked for *more* employers than Chapman over a *shorter* career than Chapman. As for Wogsland, there is no evidence in the summary judgment record about his beliefs regarding stability of an applicant's entire career.[49] With no evidence in the summary judgment record explaining why Wogsland and Turnquist apparently ignored the weaknesses in Smith's and Jones's employment histories—or even stating that they had considered their employment histories[50]—there has been no "business judgment" demonstrated and, thus, the business judgment rule should not be used to justify a grant of summary judgment.

Even if we credit the reasoning of the Defendants and use a period of thirteen

---

was more favorable than was Chapman's but, instead, addresses the manner of presentation.

**47.** The relevant portion of the deposition reads:

> You are asking me to characterize the stability of John's [Chapman's] prior employment by asking about each individual company that he has worked at. *When I evaluate the stability of an applicant I don't look at one company. I look at their entire work history as a group.* The fact that John worked for Home Insurance Company for 16 years is very commendable and it shows stability. The fact that he worked for AI Transport is commendable and it shows some stability. *But if you look at the entire employment history of the applicant you have I believe its seven jobs in that entire work history. Many applicants that we interview have multi employers but not as many as seven and it is a natur[al] question to wonder and to ask an applicant why you had these various job changes over the course of your claims or insurance career.* So to answer your question the four years tenure at AI Transport is helpful. It would appear as if John found a home there and he had been with the company for four and a half years which is good. But to characterize his entire employment history one job at a time as being stable, I cannot do that.

Turnquist Dep. at 116–17 (emphasis added).

**48.** The relevant portion of Turnquist's deposition states:

> Q. Is it true that your concerns about Mr. Chapman's stability in his work experience center on the time between his employment at the Home Insurance and his employment at the AIAC?
> A. *Not necessarily just that time frame.*
> Q. What other—what else about his employment background raises a concern about his stability?
> A. The fact that he has been with seven different companies. I'd have to count the companies again but there just seemed to be quite a number of companies that he had been with. One, two, three, four, five, six—AI Transport being the seventh.
> Q. And this is over a 35 year career, correct?
> A. Yes ma'am.

Turnquist Dep. at 120 (emphasis added).

**49.** It is unsurprising that the summary judgment record lacks evidence showing that Wogsland believed Smith's job history to be irrelevant, for Wogsland admitted at trial that Smith's job history "would have been a negative." R22–218.

**50.** Indeed, Smith stated in his deposition that he did not recall Wogsland expressing any concern about job instability or asking why he had stayed with certain employers for short periods of time and that he did not remember

years prior to being hired by AI Transport,[51] we find the following: four employers for Chapman for an average of 3.25 years per employer; four employers (over eleven years) for Jones for an average of 2.75 years per employer; two employers (over eight plus years) for Sevillian for an average of 4+ years per employer; six employers for Smith for an average of 2.17 years per employer; and two employers for Wiggins for an average of 6.5 years per employer. Thus, of the five applicants, Chapman had the third best average of years per employer over the thirteen years prior to being hired by AIG. Indeed, his average of 3.25 over those thirteen years was superior to Smith and Jones's averages for either their total career *or* the thirteen year sample period. Yet he was still rejected by Defendants as having worse "recent" job stability. Thus, even applying Defendants' theory, and applying the time period arbitrarily suggested by them and the starting point apparently used by Wogsland, I still find disparate treatment and inconsistencies.

### 3. Decisionmaker: Wogsland or Turnquist

It is not clear what role Turnquist played in the decision not to hire Chapman for any of the available positions at AIGCS. Defendants argue that Turnquist merely conducted a screening interview and, thus, that he was not a decisionmaker

for the purpose of hiring Wiggins for the position of casualty claims manager. The record, as it existed at the time that summary judgment was granted, includes several pieces of evidence that tend to dispute Defendants' characterization of Turnquist. At summary judgment, Defendants identified both Wogsland and Turnquist as the persons "who were responsible for filling the position" eventually given to Wiggins.[52] Wogsland himself identified Turnquist as one of the persons that he relied on in deciding not to hire Chapman to be a casualty claims manager and also stated that he relied on Turnquist's interview with Chapman.[53] In fact, I also note that, in stating that "Plaintiff forgets that Wogsland was the decision-maker; Turnquist merely provided a second opinion to Wogsland," Defendants cite only to Turnquist's *trial testimony*.[54] As Defendants themselves repeatedly point out, such trial testimony cannot be considered in our review of the district court's grant of summary judgment because that trial testimony was, of necessity, not in the record that the district court reviewed when considering the summary judgment motions.[55] Similarly, while defense counsel repeatedly referred at oral argument to Turnquist's statement that his interview was merely a "screening interview," Turnquist first used that term in his *trial testimony*,[56] which cannot be considered in this appeal.

---

Turnquist expressing any concern about Smith's job history. Smith Dep. at 80–81.

**51.** This suggestion is a combination of the time period suggested by defense counsel in their brief, *see En Banc* Brief of Defendants–Appellees at 6–8, and at oral argument, and the starting point testified to by Wogsland, *see* R7–79–Ex H (Wogsland Dep.) at 134 (looking at "lack of recent stability in job positions *prior to joining AI Transport* ") (emphasis added).

**52.** *See* R6–72 (Stmt. of Undisputed Facts) at 2–3 at ¶¶ 9, 17.

**53.** *See* R7–79–Ex. H (Wogsland Dep.) at 102.

**54.** *See En Banc* Brief of Defendants–Appellees at 22 (citing R23–62).

**55.** *See Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 n. 3 (11th Cir.1992) ("Upon review of a grant by a district court of a motion for summary judgment, a federal appellate court may examine only the evidence which was before the district court when the latter decided the motion for summary judgment.") (cited in *En Banc* Brief of Defendants–Appellees at 19); *U.S. East Telecomms., Inc. v. U S West Communications Servs., Inc.*, 38 F.3d 1289, 1301 (2d Cir.1994) ("Our review is confined to an examination of the materials before the trial court at the time the ruling was made, and neither the evidence offered subsequently at trial nor the verdict is relevant.") (cited in *En Banc* Brief of Defendants–Appellees at 20).

**56.** *See* R23–44 (cited at oral argument by defense counsel).

Additionally, Chapman testified that he was interviewed first by Wogsland and then by Turnquist.[57] While defense counsel asserted at oral argument, without support, that Chapman must have been "mistaken" in this testimony because Turnquist was merely a "screening interview" and, therefore, must have interviewed Chapman first, this assertion assumes that we accept Turnquist's testimony and reject contradictory evidence. This conclusion inherently requires a weighing of the evidence: something not permitted at summary judgment. *See Howard,* 32 F.3d at 524. In addition to Chapman's testimony in his deposition that he was interviewed by Wogsland prior to being interviewed by Turnquist, other evidence tends to support the claim that Turnquist was not a mere screening interview. The date on both Wogsland and Turnquist's notes from their interviews with Chapman are "10/13/92."[58] Thus, it appears that Wogsland and Turnquist both interviewed Chapman on October 13, 1992; a fact that is inconsistent with Defendants' characterization of Turnquist as a screening interview. Likewise, at their depositions, Jones[59] and Wiggins[60] both testified that they interviewed with Wogsland before interviewing with Turnquist. Thus, there is evidence tending to show that Wogsland interviewed at least three of the five applicants before Turnquist did, which, as defense counsel

implicitly recognized at oral argument, is inconsistent with the claim that Turnquist was a mere screening interview.

In their position statement to the EEOC,[61] the Defendants stated: "There were three positions to be filled in the Atlanta AIAC office. Thirty to forty people were interviewed for the positions by Ward Turnquist (age 51, White), Vice President. Three employees were hired from AI Transport *based upon the quality of their responses to Mr. Turnquist's questions.*"[62] In addition to not mentioning the alleged "job skipping" concerns, the position statement also puts the decision squarely on Turnquist—not Wogsland.

The discrepancies in the characterizations of Turnquist are significant not only because of the light they tend to cast on the credibility of both Wogsland and Turnquist. *See Howard,* 32 F.3d at 526 ("[T]he identification of inconsistencies in the defendant's testimony is evidence of pretext."); *see also Damon,* 196 F.3d at 1365 n. 6 (noting that "a jury could infer that the 'inconsistencies' between [the employer's] deposition and affidavit may be evidence of pretext"). By supporting the claim that Turnquist was a decisionmaker (or even the primary decisionmaker), this evidence also renders more important a series of his statements, all of which are in the summary judgment record and are

---

57. *See* Chapman Dep. I at 255. Chapman's Deposition occurred on two separate dates; Chapman Dep. I is the volume relating to the August 1, 1995 deposition.

58. *See* Ptf's Ex. 48 to Spann Dep. at D001071, D001072.

59. *See* Jones Dep. at 119.

60. *See* Wiggins Dep. at 69.

61. Defense counsel asserted at oral argument that the EEOC position statement was not part of the summary judgment record and that the position statement was "used only at trial." These assertions are incorrect. Indeed, the magistrate judge chastised Defendants in his summary judgment Report and Recommendation for the discrepancy be-

tween the position statement's characterization of one of Chapman's positions as a "promotion" and the testimony of Defendants' employee Valerie Crabb Zaleski that the position was "at best a lateral transfer involving less responsibility, no pay raise, and less potential for pay raises." R9–95 at 3 n. 1 (stating that "the falsehood as well as the distasteful, cavalier attitude towards the judicial process" was "disconcerting"). I, for one, find it "disconcerting" that defense counsel could not recall the position statement being part of the summary judgment record when the magistrate judge issued such a strong statement about that selfsame position statement in assessing the summary judgment record.

62. Ptf's Ex. 30 to Zaleski Dep. (EEOC Position Stmt, Attach. 1) at 2 (emphasis added).

helpful to Chapman. These statements include: (1) that Turnquist had a negative impression of Sevillian during his interview and that he told Wogsland that he "questioned whether or not Duane Sevillian would have been aggressive enough" to be the casualty claims manager;[63] (2) that Turnquist looked to the "entire history" of a candidate;[64] (3) that Turnquist's concerns were "not necessarily" focused on the timeframe between Chapman's employment by Home Insurance and his employment by AI Transport but, instead, that he was also focusing on the number of jobs that Chapman had held over his entire career;[65] and (4) that Turnquist could not recall having any concerns about Smith's job history despite the fact that he had had more employers than Chapman during a shorter career.[66] These statements are useful to Chapman in defending against summary judgment because they tend to show disparate treatment in the assessment of different candidates.

I also note that, while those statements are *more* significant if Turnquist was the final decisionmaker or one of the co-decisionmakers, they are still relevant even if he was merely a source of information for Wogsland. While Defendants cite to a line of cases holding that, where two managers disagree in their assessment of an employee or applicant, courts should look to the assessment of the final decisionmaker, those cases are inapposite in this situation where there is *no* evidence that Wogsland and Turnquist disagreed about the substance of these statements. Indeed, at no time did Wogsland and Turnquist indicate that they disagreed about anything; instead, Wogsland indicated that he *relied* on Turnquist.[67] To conclude that Wogsland disagreed with Turnquist about the caliber of Sevillian's interview or that the relevance of the number of jobs held over an entire career would require us to make impermissible assumptions and to read the inferences in favor of the summary judgment movant—contrary to the standards applied at summary judgment. *See Taylor,* 175 F.3d at 866.

### 4. "Poor" interview

The only aspect of Chapman's interview that Wogsland raised in his deposition was that Chapman "did not give us [Wogsland and Turnquist] as concise, direct answers to questions as we would like to see" and that Chapman was not "aggressive."[68] While Defendants argue that Chapman's interview was unusually short and that he failed to ask pertinent questions, Defendants cite to Wogsland's *trial testimony* for these points.[69] Because trial testimony

---

63. Turnquist Dep. at 59. Contrary to defense counsel's claim at oral argument, Turnquist's criticisms regarding the caliber of Sevillian's interview were not confined to the trial testimony. I do not dispute that Turnquist testified at trial that he "didn't think Duane was particularly aggressive ... [and] thought he was a little laid-back" in the interview and that he had told Wogsland that Sevillian's interview had not favorably impressed him. R23–32, 72. However, as Turnquist's deposition testimony makes clear, there was comparable evidence in the summary judgment record.

64. Turnquist Dep. at 116.

65. *See* Turnquist Dep. at 120.

66. *See* Turnquist Dep. at 126.

67. *See* R7–79–Ex. H (Wogsland Dep.) at 102.

68. R7–79–Ex. H (Wogsland Dep.) at 103–04.

69. *See En Banc* Brief of Defendants–Appellees at 8 (citing to trial testimony for everything other than claim that Chapman did not take an "aggressive approach in asking [Wogsland] questions"). It is particularly interesting that Defendants' only support for these critical points is trial testimony. Defendants cannot claim ignorance of the rule barring such use of trial testimony in this appeal because they invoked it in their brief, *see En Banc* Brief of Defendants–Appellees at 19–20, and at oral argument. Indeed, in a blaze of irony (or of chutzpah), Defendants specifically invoked the rule in their brief, *see id.* at 19, and at oral argument in addressing Chapman's use of trial testimony to counter these points—while ignoring the fact that Defendants' section on "What Plaintiff Said And Did During His Interview" relies on trial testimony, *see id.* at 8.

is not relevant to the question of whether summary judgment was appropriately granted before the trial testimony ever even came into existence, *see Welch,* 951 F.2d at 1237 n. 3; *U.S. East Telecomms.,* 38 F.3d at 1301, we are, therefore, limited to the allegations that Chapman's answers were not sharp [70] and that he was not "aggressive."

Wogsland noted only two specific answers with which he was "not happy": that Chapman had no "recent general liability experience" and that Chapman "wasn't very clear about why he had gone from Home to several other positions before he got to Transport." [71] Chapman has sufficiently demonstrated pretext as to both of these points.

- *Recent general liability experience:* Wogsland never stated that Chapman's answer to this question was substandard as to form—but only as to substance. It *is* undisputed that Chapman's job at AI Transport did not involve general liability work, but it is also undisputed that Chapman had general liability experience while working for Gaines and on Gaines work for The Claimsman. Additionally, as Wogsland and Turnquist's own notes from their interviews with Chapman prove, Chapman specifically told them during the interview that he'd had general liability experience working for and with Gaines.[72] Accordingly, Chapman gave Wogsland and Turnquist a specific, complete answer: that he did not do general liability work for AI Transport, but that he did have general liability experience in the period immediately preceding his time with AI Transport. To the extent that Chapman's (specific and complete) answer was unsatisfactory to Wogsland as a matter of substance, *Wiggins'* answer should have been at least as unsatisfactory to Wogsland—because he likewise did not do general liability work for AI Transport.[73] Thus, the "recent general liability experience" justification is flawed in two [74] crucial respects: because (1) Chapman gave a specific, complete answer to Wogsland's questions about general liability experience and (2) because Wiggins, the candidate chosen for the casualty claims manager position, likewise lacked general liability experience in his job at AI Transport.

- *Job history:* In direct contradiction to Wogsland's claims that Chapman's responses regarding his job changes between his employment with Home Insurance and his hiring by AIGCS were not sharp and concise, the summary judgment record includes evidence tending to show that Chapman gave reasons for every move that he made. Specifically, he left Home Insurance

70. Defendants claim that Chapman did not dispute at summary judgment "that some of his answers were not clear and concise." *En Banc* Brief of Defendants–Appellees at 19. The only cite for this remarkable statement is "Supra–8." *Id.* A brief foray to page 8 of Defendants' brief shows the disingenuity of this claim. First, the cited page of the brief cites to nothing about the clarity or conciseness of Chapman's responses—rather, it addresses the length and substance of Chapman's interview with Wogsland and asserts that Chapman failed to allege that he asked questions during his interview. *See id.* at 8. Even worse, the support cited on page 8 for this point is *not* from the summary judgment phase of the case but, instead, comes from the trial testimony, *see id.,* and, as reiterated throughout this opinion and throughout De- fendants' brief and argument, is accordingly immaterial to this appeal.

71. R7–79–Ex. H (Wogsland Dep.) at 107–08.

72. See Ptf's Ex. 48 to Spann Dep. II at D001071–72.

73. *See* R7–79–Ex. H (Wogsland Dep.) at 107.

74. A third way that this argument is flawed is that it assumes that Chapman's general liability experience with The Claimsman, Gaines, and B.R. Martin is not "recent." As previously noted, Wogsland ignored this period of time when assessing Chapman's "recent" general liability experience, while he apparently included it when assessing Chapman's "recent" job history.

because he was forced out and then began to work for The Claimsman on Gaines files; he left The Claimsman when Gaines ceased its contractual relationship with The Claimsman; he was then hired by Gaines to work on Gaines files; he left Gaines because Gaines had been purchased by Liberty National Fire Insurance Company and had moved its claims department from Atlanta to Birmingham and because he was then offered the opportunity to work with B.R. Martin in California, again on Gaines files; he left B.R. Martin because B.R. Martin lost an important client and no longer had sufficient work for its employees; he returned to Atlanta and began to work with AIGCS. Regardless of whether Wogsland and Turnquist agree with Chapman's assessment that the reasons (particularly as they relate to his consistent work with Gaines) demonstrate stability, they do not deny that these reasons were given during his inter-

views with them. Indeed, both Wogsland and Turnquist stated in their depositions that they did not recall the substance of Chapman's answers about his job history.[75]

Accordingly, because Chapman has offered testimony tending to show that he did, in fact, give Wogsland and Turnquist specific answers to their questions, he has successfully disputed the substance of Wogsland and Turnquist's complaints—namely, that he did not provide specific answers to his questions.[76] Thus, the only remaining contention is that his answers were, as a matter of form, somehow lacking in sharpness, conciseness, or aggressiveness.

For three reasons, I conclude that the contention that his answers were lacking as a matter of form remains in dispute and, thus, that Chapman has established pretext as to this justification. The first two reasons flow from the simple proposition that the best evidence of the form of

**75.** *See* R7–79–Ex. H (Wogsland Dep.) at 107–08; Turnquist Dep. at 113; *see also* Ptf's Ex. 48 to Spann Dep. II at D001071 (grouping The Claimsman and Gaines on one line and grouping with B.R. Martin in one timeframe); *see also* Ptf's Ex. 48 to Spann Dep. at D000065–D000068 (Chapman's 1988 job application and resume). Indeed, at trial, Turnquist admitted that his interview notes may indicate that he viewed The Claimsman and Gaines as substantively the same job. *See* R23–81–82. While we cannot consider this on the merits, for it was not available at summary judgment, it tends to show that a reasonable factfinder could likewise read the notes as indicating that Chapman did give Turnquist specific reasons for his job changes. While the majority opinion asserts that "the reasons [the dissent] cites are drawn from the explanations for those moves that Chapman gave after the lawsuit was filed, not during the interviews," Majority op. at 1021–22 n.10, the interview notes tend to show that he did, in fact, offer these explanations during his interview. Also, Chapman's 1988 job application and resume, which were in his personnel file, *see* Ptf's Ex. 48 to Spann Dep. at D000065–D000068, include both the dates when he was employed by each of his employers *and* the explanations cited in this dissent. Thus, this pre-existing evidence, which was available to Wogsland and Turnquist at the

time of the 1992 interviews, nullifies any inference that Chapman manufactured these explanations in anticipation of litigation or that he was seeking to hide the dates of his employment changes.

**76.** This disputative evidence is much more useful than the conclusory statements that defense counsel stated at oral argument were missing in this case. Subjective perceptions of an employee, without more, are insufficient to survive summary judgment. *See, e.g., Holifield,* 115 F.3d at 1565. Here, instead, Chapman has offered something much more valuable: testimony and evidence tending to show that he gave specific answers to the questions that he was asked and provided precise information which could be assessed by Wogsland and Turnquist. *See Dey,* 28 F.3d at 1460 ("Although general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or co-workers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies."). In light of that evidence, I see no reason to require Chapman to regurgitate language stating that his interview went well—particularly in light of the great body of caselaw indicating that such subjective perceptions are not relevant.

the answers given at an interview are the answers themselves. Given the evidence that Chapman did, in fact, give specific answers to the questions asked of him, *i.e.*, the evidence that he answered with completeness and specificity the questions about his general liability experience and his recent job history, I would conclude that Chapman has sufficiently disputed the contention that his answers lacked sharpness, conciseness, or aggressiveness.[77] This conclusion is supported by my second reason: that Wogsland and Turnquist's recollections of the interviews were so lacking in detail [78] as to be purely subjective—with no objective elements that could reasonably be disputed (other than the disputed allegations about Chapman's answers to questions about his general liability experience and job history). My third reason relates to the fact that there is no contemporaneous evidence supporting Wogsland and Turnquist's claims that they found Chapman to lack aggressiveness or to have otherwise had a poor interview. It is undisputed that neither Wogsland nor Turnquist wrote any remarks on their notes from the interviews with Chapman that indicated that Chapman's interview lacked aggressiveness [79] or was otherwise poor in quality—indeed, they made no notes regarding their perspective on Chapman's personality, performance as an interviewee, or character. Thus, there is no evidence supporting Wogsland and Turnquist's *post hoc* rationalizations that they found Chapman's interview to be in any way lacking. In light of the fact that both Wogsland and Turnquist assert now (years later) that they rejected Chapman on the basis of his interviews, this "lacking" is suspicious. Their present claim that they made no such notes because they were merely summarizing the interviews should be assessed by the jury.

### 5. *Other Disparate Treatment*

At summary judgment, Chapman offered evidence tending to show disparate treatment as compared to the other applicants. In light of the undisputed fact that Chapman's education and performance evaluations were equal to or superior to that of the other applicants, this evidence of disparate treatment gains heightened significance. Having already addressed the disparate treatment of Chapman as to his job history and as to his "poor" interview, I will focus two other types of disparate treatment to which Chapman was subjected: that he, alone of all of the

---

**77.** This reason differs from the separate claim, discussed further in this dissent, that this is one of the rare cases where the establishment of pretext as to the objective justifications is sufficient to establish pretext as to a purely subjective justification.

**78.** *See, e.g.*, R7–79–Ex. H (Wogsland Dep.) at 104–05 ("Q. Can you remember any examples? A. Not specific comments, quotes. Q. Can you remember any general examples? I am not asking you for word-for-word quotes. A. No, I can't."); *id.* at 108 ("[Chapman] wasn't very clear about why he had gone from Home to several other positions before he got to Transport, but I don't remember the exact questions or the exact answers."); Turnquist Dep. at 113 (stating that he could not recall what information that Chapman had given him about his job changes). *Cf.* Turnquist Dep. at 58–59 (discussing Sevillian's interview and stating, "I couldn't tell you specifically what comments were made that far back. I just can't recall.").

**79.** Indeed, at no time in the summary judgment record did either Turnquist or Wogsland offer any definition of "aggressive." "Aggressive," like "recent," is a term given to many different interpretations, and without knowing what definition Turnquist and Wogsland applied, Chapman was left unable to rebut their allegation. Did they believe that Chapman asked too few questions? Asked questions, but did not ask perceptive, searching ones? Asked questions that were sufficient in number and in subject matter, but which were poorly phrased? Evaded questions? Answered the questions that were asked but used poor phrasing? Asked questions and gave answers in an acceptable manner, but had mannerisms or body posture that seemed too "laid back"? Any of these, or some combination of them, could be deemed "nonaggressive." The lack of definition, therefore, rendered the claim that Chapman was not "aggressive" unrebuttable and, therefore, legally insufficient under *Burdine*.

applicants, was not considered for multiple positions and that he, unlike Wiggins, was singled out for lacking "recent" general liability experience.

### a. Consideration for multiple positions

Unlike each of the other applicants, Chapman was considered for only one position: the casualty claims manager position. Once rejected for that position, he was not considered for any other position. As a primary point, I note that it is undisputed that Chapman never limited his interest to the casualty claims manager position.[80] At his deposition, Wogsland admitted that neither the written message from Chapman applying for any open position with AIGCS nor Chapman's oral statements at his interview indicated that his interest was limited to the casualty claims manager position.[81] Despite Chapman's apparent interest in *any* open positions, Wogsland not only did not consider Chapman for positions other than the casualty claims manager position, but he did not even bother to consider whether he was qualified for the other open positions.[82] I also note that there is no evidence disputing Chapman's claims that he was qualified for the other open positions.[83]

Wogsland and Turnquist's treatment of Chapman contrasts strongly with each of the other candidates. *Jones* was hired from AI Transport by AIGCS for a Complex Director position in March 1993. He initially interviewed with Turnquist in October 1992 for approximately 45 minutes and with Wogsland for the casualty claims manager position even though he only wanted the Complex Director position. After a new Complex Director position was created, Turnquist hired Jones. Thus, Jones was considered for two positions, including one for which he was explicitly not interested.[84] *Sevillian* was hired from AI Transport by AIGCS in October 1992 as a fast track manager.[85] He stated that he limited his application to the claims manager position, which he stated was the same as the fast track manager position.[86] However, when he interviewed with Turnquist, he was not interviewing specifically

**80.** *See* R5–70–Ex. I (Wogsland Dep.) at 186–90; *see also* Turnquist Dep. at 63 (testifying that Turnquist never said that he was interested solely in the casualty claims manager).

**81.** *See* R5–70–Ex. I (Wogsland Dep.) at 189.

**82.** *See* R5–70–Ex. I (Wogsland Dep.) at 188 ("I considered [Chapman] for the casualty manager position. *I didn't really go through his qualifications versus the requirements for the other positions.*") (emphasis added). I note that, even if we were able to consider Wogsland's trial testimony that he did not consider Chapman for the other positions because he was "overqualified," R22–212–13, that testimony would stand in apparent contradiction with the admission in his deposition that he failed to consider Chapman for the other positions.

**83.** It is unsurprising that there is no evidence in the summary judgment record disputing this claim, for Wogsland admitted at trial that Chapman was qualified for all of the positions open at AIGCS in 1992–93. *See* R22–188. I also note that, at summary judgment, Chapman asserted that "[b]ased on [his] more than

thirty successful years as a claims professional in the insurance industry, strong performance appraisals, and law degree from an accredited law school, Mr. Chapman was *more qualified than these other candidates,*" including Jones, Sevillian, Smith, and Wiggins. *See* R5–70 (Stmt. of Undisputed Facts) 8–9 at ¶ 26. In responding to this claim, Defendants cited to materials disputing Chapman's superiority *only as compared to Wiggins* and *only as to the casualty claims manager position.* *See* R8–82 at 17–18 at ¶ 26 (citing Turnquist Dep. at 64, 78–79; Wogsland Dep. at 102–08, 111). The only statement even referring to other candidates addresses "recent" general liability experience—which was only in relation to the casualty claims manager position and, accordingly, does not dispute Chapman's claim that he was better qualified than Jones, Sevillian, and Smith for the positions that they received.

**84.** *See* Jones Dep. at 116–22; Turnquist Dep. at 70.

**85.** *See* Sevillian Dep. at 51.

**86.** *See* Sevillian Dep. at 49, 51–52.

for the fast track manager position.[87] Turnquist testified that he considered Sevillian for the casualty claims manager position.[88] Accordingly, Sevillian was considered for two different positions, including one for which he did not apply. *Smith:* In applying to AIGCS for transfer from AI Transport, Smith indicated that he was not interested in either the fast track manager or claim representative positions.[89] When Wogsland interviewed Smith, he indicated that he was considering him for either the senior claims representative position or the senior casualty specialist.[90] Smith also interviewed with Turnquist,[91] who indicated in his deposition that he was interviewing Smith for the casualty manager position.[92] Thus, Smith was considered for three positions, including one position in which he was specifically not interested. *Wiggins:* Wiggins was hired for the casualty claims manager position despite telling both Wogsland and Turnquist that he was interested in the claims director position and that he was specifically *not interested* in the casualty claims manager position. Wiggins was told that he could be considered for other claims director positions that became available at a later time. Thus, Wiggins was considered and hired for a position for which he had stated he had no interest and also received assurances that he would be considered later for a different position.[93]

### b. Lack of "recent" general liability experience

Wogsland testified in his deposition that he was not happy with Chapman's statement that he had "not had any recent general liability experience."[94] When asked if the other applicants had stated that they had "recent" general liability experience, Wogsland testified that "[a]ll except for Mr. Wiggins" did.[95] Yet it was Wiggins who was given the casualty claims manager position over Chapman.[96] Wogsland justified Wiggins' lack of "recent" general liability experience on the ground that Wiggins "had been working for the same AI Transport that Mr. Chapman had."[97] Wogsland never explained, however, why he considered Chapman's lack of "recent" general liability experience to be a negative, unlike with Wiggins, who equally lacked "recent" general liability experience *for the precise same reason as Chapman.*

### D. Analysis

As I have discussed at length, the summary judgment record is plagued by a large number of gaps and inconsistencies. As a result, a number of material disputed facts exist that weaken Defendants' proffered nondiscriminatory reasons to such an extent that summary judgment is inappropriate.

#### 1. Arguments Applicable to All Four Applicants

##### a. "Recent" history of job skipping

In considering the job history justification, I find a number of material gaps and inconsistencies in the record, as well as evidence of disparate treatment. First, Defendants have never defined the term "recent," which renders vague and uncertain Wogsland and Turnquist's claims that they rejected Chapman for his "recent" job instability. Second, the record indicates that Wogsland selectively applied

87. *See* Sevillian Dep. at 63.

88. *See* Turnquist Dep. at 58.

89. *See* Smith Dep. at 79.

90. *See* Smith Dep. at 82.

91. *See* Smith Dep. at 81–82.

92. *See* Turnquist Dep. at 126.

93. *See* Wiggins Dep. at 67–70.

94. *See* R7–79–Ex. H (Wogsland Dep.) at 107.

95. R7–79–Ex. H (Wogsland Dep.) at 107.

96. *See* R7–79–Ex. H (Wogsland Dep.) at 107.

97. R7–79–Ex. H (Wogsland Dep.) at 107.

two different definitions of "recent" in evaluating Chapman's job application—one which included his time working for The Claimsman, Gaines, and B.R. Martin and one which did not include that timeframe. Particularly disturbing is the fact that those different definitions were selectively applied in order to effect the maximum damage to Chapman's application. Third, Chapman gave explanations regarding each of his job changes, but neither Wogsland nor Turnquist could explain what reasons (if any) they used to justify ignoring those explanations. Indeed, neither Wogsland nor Turnquist could recall what answers Chapman gave regarding his job changes. Fourth, in evaluating the job histories of the various candidates over a time frame starting with the date on which Chapman was hired by AIGCS in 1988, his average years with each employer compares favorably with all of the other candidates and is superior to two of the candidates (Jones and Smith). Fifth, Turnquist admitted that he considered the entire job history of applicants to be relevant in assessing job stability. This not only tends to negate the claims of "recent" job instability, but also makes more relevant the fact that Chapman's average years with each employer over his entire history compares favorably with all of the other candidates and is, again, superior to two of the candidates (Jones and Smith). Sixth, Turnquist's admission that he did not recall having *any* concerns about Smith's prior employment history is evidence of disparate treatment of Chapman as compared to Smith (who had averaged fewer years per employer than Chapman regardless of whether one considers their entire job histories or the timeframe prior to Chapman's hiring in 1988). Seventh, when Defendants had the opportunity to state in their EEOC Position Statement that the "recent" history of job instability was a

reason for their decision not to hire Chapman, they rested solely the applicants' interviews with Turnquist as their reason for refusing to hire him for the casualty claims manager position.[98] Eighth, notwithstanding defense counsel's arguments to the contrary, there is no evidence in the summary judgment record indicating that Wogsland had any beliefs about the relevance of an applicant's entire job history when assessing that applicant's job stability.

### b. "Poor" Interview

Gaps and inconsistencies in the record and evidence of disparate treatment likewise undermine the "poor" interview reason proffered by Defendants. First, the evidence indicates that Chapman gave Wogsland a complete answer to both of the questions specified by Wogsland in his deposition. As to the "recent" general liability experience, the evidence indicates that Chapman told Wogsland that his position at AI Transport did not involve general liability work but that his work with on Gaines files during the time period immediately preceding his hiring by AIGCS in 1988 did involve general liability work. Regardless of whether Wogsland did not like the substance of this response (a claim significantly weakened by the fact that Wiggins likewise lacked such "recent" general liability experience), the response was still complete. As to Chapman's job history, the evidence indicates that he had reasons for each of the moves that occurred in the 1980's. Again, regardless of whether Wogsland and Turnquist did not like the substance of this response (a claim without support in the record, as neither Wogsland nor Turnquist could remember what response they were given),[99] the evidence indicates that he did provide complete re-

---

**98.** Ptf's Ex. 30 to Zaleski Dep. (EEOC Position Stmt., Attach. 1) at 2.

**99.** In particular, defense counsel's hypothesis that Wogsland and Turnquist preferred loyalty to an employer over loyalty to a client

remains just that—a hypothesis, without any evidentiary value in the *McDonnell Douglas* scheme. *See Burdine,* 450 U.S. at 255 n. 9, 101 S.Ct. at 1094 n. 9.

sponses to the questions about his job history.

Additionally, Wogsland and Turnquist's claims that Chapman's interview was insufficient as a matter of form are likewise in dispute. First, there is no definition of "aggressive" in the record. This renders their claim vague and irrebuttable, in contravention of *Burdine*. Second, the evidence that Chapman did, in fact, answer completely the two questions specified by Wogsland tends to dispute the claims as to form. Third, Wogsland and Turnquist's recall of the interview was so lacking in detail and so conclusory in description as to be purely subjective and, thus, to lack value under *Burdine*. Fourth, Wogsland and Turnquist's notes from Chapman's interviews include no notations regarding their perspective on his personality, character, or performance as an interviewee. Fifth, there is evidence of disparate treatment, with Sevillian being hired despite Turnquist's perception of Sevillian as not sufficiently aggressive.

### c. Other Disparate Treatment and Inconsistencies

In addition to the disparate treatment discussed above regarding Defendants' two proffered reasons, the record reflects two other instances of disparate treatment. First, Wogsland treated Chapman's lack of "recent" general liability experience as a negative—yet hired Wiggins, who lacked "recent" general liability experience for the exact same reason as did Chapman. Indeed, Wogsland did not state that he even considered that lack to be a negative in evaluating Wiggins' application. Second, unlike the other applicants, Chapman was considered for only one position, despite his unlimited request to be considered for any of the open positions. No reason was given at summary judgment for Defendants' failure to consider Chapman for the other open positions.

Finally, the role that Turnquist played in the decision not to hire Chapman in the fall of 1992 is disputed. There is evidence in the summary judgment record supporting the claim that he was the sole decisionmaker, that he was a co-decisionmaker with Wogsland, that he was an important source of information on which Wogsland relied, and that he was a screening interview. This dispute is important both because of significant admissions made by Turnquist and because of the light that this inconsistency sheds on Wogsland and Turnquist's credibility.

### d. Cross-applying Pretext

This is one of the rare cases in which it is appropriate to permit a showing of pretext as to one proffered reason to be considered in evaluating another proffered reason. First, the evidence indicates that the two reasons, "recent" history of job stability and "poor interview," are intertwined. The summary judgment record indicates that Wogsland and Turnquist did not conclude that Chapman was *per se* precluded from the casualty claims manager position by virtue of his job history. Rather, the testimony indicates that they decided to ask Chapman about his recent job history and that they were not pleased with his answers, even though they could not recall what his answers were.[100] In short, the evidence indicates that the perceptions as to the "poor interview" and the perceptions as to "recent" job instability are interrelated. The showing of pretext as to both of the reasons is likewise partly related. In particular, there has been a showing of disparate treatment as to Smith with both the "recent" job instability reason and the "poor interview" reason, as well as with the separate claim that all of the applicants (including Smith) other than Chapman were considered for multiple positions. Second, this is a case in which numerous challenges have been made as to the credibility of the decisionmakers—as to both of the proffered reasons.

---

**100.** *See* R7–79–Ex. H (Wogsland Dep.) at 107–08; Turnquist Dep. at 78–79.

Additionally, I conclude that the vague and subjective elements of these proffered reasons justifies evaluating each of the reasons in light of the evidence of pretext offered as to the other reasons. Both proffered reasons include at least one element that is vague. In the case of "recent" job instability, the term "recent," which was never defined in the record, is sufficiently unclear that we have had *six* different meanings of it suggested in the record, by defense counsel, and by the majority: (1) some vague period beginning at the time of the 1992 interviews and extending back at least to the time that Chapman left Home Insurance (defense counsel at oral argument); (2) some vague period beginning at the time of the 1988 interviews and extending back at least to the time that Chapman left Home Insurance (Wogsland in assessing Chapman's job history); (3) seven years before the 1992 interviews (Defendants' *en banc* brief); (4) ten years before the 1992 interviews (Defendants' *en banc* brief); (5) twelve to thirteen years before the 1992 interviews (Defendants' *en banc* brief and defense counsel at oral argument); and (6) the time period during which Chapman was at AIGCS/AI Transport (Wogsland in assessing Chapman's "recent" general liability experience). The vagueness of the term is exacerbated by the fact that the only thing that is clear in the record is that Wogsland selectively applied two different definitions of it to Chapman. In the case of the "poor interview" justification, the key term used by both Wogsland and Turnquist is that Chapman was not "aggressive." With no definition in the record, this characterization was even more susceptible to refutation than such a subjective characterization would usually be. Additionally, the "poor interview" reason was rendered purely subjective by the faulty memories of Wogsland and Turnquist, who could recall only their perceptions of Chapman's responses—and not the responses themselves. Thus, while they used words like "sharp," "concise," and "aggressive," their inability to recall either

the substance or the form of Chapman's responses and other statements from the interviews had no objective content.

### e. Conclusion

Accordingly, I would conclude that summary judgment was inappropriate as to each of the four other positions because Chapman has demonstrated pretext as to each of the proffered reasons both independently and as considered together. Additionally, I would conclude that the purely subjective aspects of the "poor interview" justification are not legitimate under *Burdine* because they cannot be objectively evaluated. I would also conclude that the large amount of evidence undermining Wogsland and Turnquist's credibility creates a jury question as to the verity of their proffered reasons, which are both at least partly subjective and, therefore, reliant on credibility for their validity. Finally, in light of the disparate treatment of Chapman as to the evaluation of his job history and of his interview, the treatment of his lack of "recent" general liability experience as compared to Wiggins, and the unexplained failure to consider him for multiple positions, I would conclude that Chapman has produced sufficient evidence to create a jury question as to whether it is more likely that Chapman's rejection was caused by discriminatory animus than by the proffered reasons.

### 2. Application to Jones, Sevillian, and Smith

In addition to the above points, which are relevant to all four positions, I conclude that summary judgment was inappropriate because of the failure of Defendants to offer *any* legitimate, nondiscriminatory reasons at summary judgment for their failure to consider Chapman for any positions other than the casualty claims manager position. Defendants have proceeded under the useful fiction that the nondiscriminatory reasons offered to justify their refusal to hire Chapman for the casualty

claims manager position likewise apply to their decision not to hire Chapman for the positions given to Jones,[101] Sevillian, and Smith—but that claim is, indeed, a fiction. No reason was given at summary judgment for the failure to consider Chapman for the other positions given to AI Transport applicants.[102] Thus, even if I agreed with the majority in its analysis of the pretext issue as it applies to Wiggins and the casualty claims manager position, I would still conclude that summary judgment was inappropriate in light of the fact that no nondiscriminatory reason was ever proffered for selecting Jones, Sevillian, and Smith without even considering Chapman for their positions. *See Alexander,* 207 F.3d at 1342 (holding that where employer "failed to offer any legitimate non-discriminatory reason to explain why [one applicant] was promoted over [the plaintiff], a reasonable

jury could attribute the [employer's] failure to promote [the plaintiff] to race").[103]

## III. Conclusion

As the record makes clear, summary judgment was improvidently granted. While I do not disagree with the majority that a reasonable jury, faced with the evidence in this case, could conclude that the asserted nondiscriminatory reasons were sincere and, therefore, not pretextual, it is manifest that a reasonable jury could instead conclude that the reasons were not sincere—that they were, in fact, a mask for age discrimination. In reaching this conclusion, I do not challenge the employer's business judgment—but I do require that the employer *make* a business judgment. I do not deny the possibility that a jury trial could end in a verdict for the defendants—but I do conclude that a jury

**101.** The majority also treats Chapman's termination for insubordination as a potential justification for Defendants' decision to hire Jones, instead of Chapman. In addition to the fact that this justification was never proffered at either summary judgment or on appeal and, thus, has been waived, *see Campaign for a Prosperous Georgia,* 149 F.3d at 1287; *Depree,* 946 F.2d at 793, my search of the record confirms what plaintiff's counsel stated at oral argument when questioned about this very point: there is no evidence in the record tending to show that Turnquist (who hired Jones) knew about the termination for insubordination at the time that he hired Jones or that Turnquist relied on that insubordination for his decision to hire Jones instead of Chapman. Such after-acquired evidence cannot be used as the basis for Defendants' employment decision. *See McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 359–60, 115 S.Ct. 879, 885, 130 L.Ed.2d 852 (1995) (establishing after-acquired evidence rule: where employer discovers evidence after making an employment action that would justify its decision, "[t]he employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was [not hired] for the nondiscriminatory reason"). Accordingly, Chapman's termination for insubordination cannot be relied upon as a nondiscriminatory reason for hiring Jones instead of Chapman.

**102.** It is arguable that, given Defendants' utter failure at summary judgment to explain the decision not to consider Chapman for the positions given to Jones, Sevillian, and Smith, that summary judgment should have been granted to Chapman. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094 ("Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case."). Having alleged that his experience, education, and performance evaluations rendered him more qualified than Jones, Sevillian, and Smith for the positions which they received, Chapman has established his *prima facie* case, which has never been disputed.

**103.** *Cf. Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1134 (11th Cir.1984) (holding that, where plaintiff was not given opportunity to apply for a specific job, "the defendant's subjective promotion procedures imposed upon the defendant a duty to consider for any open position all employees who might reasonably be interested in the position"); *Harris v. Birmingham Bd. of Educ.,* 712 F.2d 1377, 1382 (11th Cir.1983) (holding that "false assumption ... that [the plaintiff] was not interested" in a position is not a legitimate nondiscriminatory reason).

trial is required. As we have previously admonished, "[s]ummary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." *Tippens v. Celotex Corp.*, 805 F.2d 949, 952–53 (11th Cir. 1986). Put differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In this case, we should reverse the grant of summary judgment and remand for a jury trial so that the jury may serve its unique factfinding function—particularly where, as here, the credibility of interested parties is at the heart of the case. Accordingly, I must respectfully dissent.